In re Sebastian J. ARCHANGELI, Debtor.

CAMDEN NATIONAL BANK, Plaintiff,

v.

Sebastian J. ARCHANGELI, Defendant.

Bankruptcy No. 179–10075.
Adv. 180–0012.

United States Bankruptcy Court, D. Maine.

Sept. 5, 1980.

See also, Bkrtcy., 6 B.R. 48.

Anita M. V. Frier, Rockland, Me., for debtor.

Robert C. Perkins, Harmon, Jones & Sanford, Camden, Me., for plaintiff.

### MEMORANDUM DECISION

CONRAD K. CYR, Bankruptcy Judge.

Camden National Bank [Bank] seeks a dischargeability determination under Bankruptcy Code § 523(a)(2).

On July 24, 1979, the debtor received a loan in the principal amount of $6,000.00 from the Bank. A financial statement submitted by the debtor in October of 1978 in connection with a separate loan transaction reflects that the debtor was employed by Bicknell Manufacturing Company, Harper Tool Company, and Consolazio Tool Company, from whom he listed annual net income of $11,480.00, $15,000.00 and $5,000.00, respectively, for a total annual net income of $31,480.00. This financial statement also describes certain assets of the debtor, including real estate in Rockland, Maine having a value of $45,000.00, out-of-state real estate having a value of $25,000.00, a 1978 Grady White boat and motor having a value of $9,000.00, and a 1972 Lincoln Continental valued at $3,100.00. The listed liabilities consist of a $30,600.00 mortgage debt on the Rockland property, a $4,000.00 mortgage debt on the out-of-state real estate, and unsecured debts totaling $13,550.00.

The Bank's Vice President testified that the subject loan was made to the debtor on the basis of the information contained in the earlier financial statement, an independent credit check, and the prior excellent credit dealings between the parties. At the date of bankruptcy, the balance due the Bank was $5,931.43, plus interest.

The financial statement greatly exaggerates the debtor's income from Harper Tool Company and Consolazio Tool Company. In fact, the debtor testified that he received $800.00 in 1977, approximately $5,000.00 in 1978, and approximately $4,000.00 in 1979 from Harper Tool Company. The debtor admitted that he received no income whatever from Consolazio Tool Company at any time. In addition, the financial statement fails to show that the Grady White boat and motor were mortgaged to Damariscotta Savings Bank.

The evidence established that the financial statement was signed by the debtor, although the debtor testified that the statement was signed in blank, an assertion which was categorically denied by the Bank's loan officer. The court finds that the financial statement was made and published by the debtor in order to induce the Bank to grant the loan. The debtor sub-

mitted the financial statement, knowing it to be false, with the intent that the Bank rely upon it. The debtor at no time indicated to the loan officer that the financial statement was anything other than what it appeared to be an accurate statement of the debtor's financial condition.

While the debtor testified that his commission sales relationships with Harper Tool Company and Consolazio Tool Company offered the potential for realizing the income listed on the financial statement, at the time the debtor published the statement he had no such income and the history of his relationships with these two companies does not warrant these exaggerated income projections. These gross exaggerations, coupled with the listing as an unencumbered asset of the 1978 Grady White boat and motor, evidence an active intent to deceive.

The false representations made by the debtor concerned his financial condition. The Bank's claim of nondischargeability under Bankruptcy Code § 523(a)(2)(A) cannot therefore be sustained, since the false representations involved "a statement respecting the debtor's . . . financial condition." Bankruptcy Code § 523(a)(2)(A).

In order for discharge relief to be withheld under Bankruptcy Code § 523(a)(2)(B) it is necessary not only that the false financial statement be made or published with intent to deceive, but that the statement be materially false and that the creditor reasonably rely thereon to its detriment.[1]

The representations on the financial statement pertaining to the debtor's income and to his equity in certain real and personal property were materially false.

■ The legislative history suggests that a sufficient showing of reliance to the detriment of the lender may be made under § 523(a)(2)(B)(iii), even absent "fresh cash," where the refinancing was accomplished on substantially different terms than the original obligation.[2] While no new money was advanced in connection with the July 24,

1979 loan and the debtor was not in default under any prior loan agreements, the Bank's loan officer testified that he was concerned about the debtor's financial condition and that the July 24, 1979 loan transaction was for the purpose of consolidating all outstanding loans in order to facilitate the debtor's cash flow. The consolidation effectively postponed the maturity dates on the refinanced loans, giving rise to an extension of credit as a result of the deferral of the due dates on the refinanced loans.

The loan officer testified that he relied on the statements of income and that he would not have approved the July 24, 1979 consolidation loan without collateral. Yet he admitted that even had he known of the actual extent of the interests of the debtor in the listed collateral, the consolidation loan might nevertheless have been in the Bank's best interests, inasmuch as the cash flow relief thereby occasioned was probably essential to enable the debtor to satisfy his indebtedness to the Bank. There was no evidence that the Bank attempted to verify the accuracy of the financial statement. No attempt was made to contact the listed employers in order to verify the debtor's income.

The court concludes that the Bank did not rely on the debtor's statements as to income and assets in granting the consolidation loan. A new and current financial statement was not obtained by the Bank at the time of the July 24, 1979 loan. The evidence shows, and the court finds, that the July 24, 1979 loan was made after an assessment by the loan officer that it would be in the Bank's best interests to consolidate all outstanding loans. The court further finds that the Bank made the consolidation loan for its own purposes, rather than on the strength of the income and assets reflected on the October, 1978 financial statement. Essentially, the Bank desired to "stretch out" and combine earlier loans, none of which was in default, as a means of alleviating an anticipated cash

---

1. *See* Bankruptcy Code § 523(a)(2)(B)(iii). *See also* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), at 130, U.S.Code Cong. & Admin.News 1978, p. 5787.

2. *Id.*

flow problem in return for a commitment by the debtor to pay interest to the Bank over a longer term. Reliance, an essential element under Bankruptcy Code § 523(a)(2)(B), was lacking here. Moreover, any reliance the Bank may have made upon the false representations made by the debtor in his October, 1978 financial statement was in no way detrimental to the Bank, in whose own best interests it clearly was to grant the consolidation loan of July 24, 1979. Accordingly, the Bank's claim totaling $5,931.43 is held to be dischargeable under Bankruptcy Code § 523(a)(2)(B).

Since this consumer debt has been determined dischargeable in an action initiated by the plaintiff–creditor under Bankruptcy Code § 523(a)(2), Bankruptcy Code § 523(d) requires that the court grant judgment against the plaintiff and in favor of the debtor for costs and a reasonable fee to counsel for the debtor, unless to do so would be clearly inequitable. By reason of the fact that the Bank has demonstrated an actual intent to deceive on the part of the debtor, it is the view of the court that the Bank initiated this action in good faith. Accordingly, the court concludes that it would be inequitable to award either costs or attorney fees to the debtor in these circumstances.