**In the Matter of Edward EBBIN and Carol Ebbin a/k/a Carol Ann Ebbin, Debtors.**

**BANK OF COMMERCE, Plaintiff,**

v.

**Edward EBBIN, Defendant.**

**Bankruptcy No. 83 B 10119(PBA).**

**Adv. No. 83–5401–A.**

United States Bankruptcy Court, S.D. New York.

Sept. 14, 1983.

---

4. § 1307

Harry Gurahian, New York City, for Bank of Commerce; Ernst L. Bendix, New York City, of counsel.

Northrop & Jessop, New York City, for Edward Ebbin; Leon A. Harris, New York City, of counsel.

PRUDENCE B. ABRAM, Bankruptcy Judge:

On April 6, 1983, Bank of Commerce initiated this adversary proceeding seeking to have a debt of $14,516.53, together with interest and costs, declared to be nondischargeable under Bankruptcy Code § 523(a)(2)(B), 11 U.S.C. § 523(a)(2)(B), as to Edward Ebbin. Mr. Ebbin interposed an answer and a trial was held before the court on July 8, 1983. The court has concluded on the basis of all of the evidence as set forth below in its findings of fact and conclusions of law that the debt is dischargeable and that its discharge is not barred by Bankruptcy Code § 523(a)(2)(B).

### FINDINGS OF FACT

Sometime in mid-1979, Mr. Ebbin commenced a business in the name of Eagle & Fox. Eagle & Fox was a partnership between Mr. Ebbin and his wife. His wife is not a defendant in this adversary proceeding and her role in the business is not a matter of record. Eagle & Fox was in the business of buying handmade artisan collectibles, principally American Indian jewelry, from the artisans and selling it to department stores such as Saks Fifth Avenue and Bloomingdale's.

At the time Eagle & Fox was formed, Mr. Ebbin had been employed by Colgate-Palmolive for approximately 17 years. His most recent position was as group product manager in which position he was responsi-

ble for running a group of products in terms of being responsible for all promotion and advertising to support the sales of those products. Sometime before the events material to this matter, Mr. Ebbin left Colgate-Palmolive.

In mid-1981, Mr. Ebbin approached Bank of Commerce, the plaintiff in this adversary proceeding about securing a commercial loan, the proceeds of which were to be used in the Eagle & Fox business. On August 3, 1981 in connection with obtaining the loan, Mr. Ebbin signed a financial statement as of July 31, 1981 as to his and his wife's financial condition.[1] The statement is on a printed form supplied by and addressed to Bank of Commerce, but the form itself is one suggested by the Federal Reserve Bank of New York. Mr. Ebbin had the form completed by his accountant, Stuart Schmall. Mr. Schmall's uncontradicted testimony is that he simply filled in numbers supplied to him by Mr. Ebbin and that Mr. Ebbin requested assistance because he did not know which lines to put the information on.

Immediately before Mr. Ebbin's signature on the August 3 financial statement appears the following:

"Certification—This is to certify that all the statements contained herein and in any supporting schedules are true and give a correct showing of my financial condition as of the date indicated. I further certify that I had no liabilities, direct or contingent, business or accomodation, except as set forth in this statement, and that title to all assets therein set forth is in my name solely, except as may be otherwise noted. IN THE EVENT OF ANY MATERIAL ADVERSE CHANGE IN MY FINANCIAL CONDITION, I AGREE TO NOTIFY THE FINANCIAL INSTITUTION NAMED HEREIN IMMEDIATELY IN WRITING."

This August 3 financial statement reflects the following assets:

---

1. The court accepts the testimony of Robert Wall, an officer of the Bank of Commerce that the statement was delivered to the Bank of Commerce on August 4 or 5 before any loan was made and that the date stamp of August 10 on the form simply reflects the date the form worked its way through the Bank's paperwork system.

| Capital—Eagle & Fox | $38,800 |
| Jewelry, Furs, Home Furnishings | 45,000 |
| Fully Vested Pension Plan | 35,000 |
| | $119,308 |

Net worth is stated to be $102,208; the only liabilities shown are notes payable to banks of $17,000, detailed on a supplemental schedule appearing below the balance sheet itself. The detail is as follows:

| Bankers Trust Co. | $ 4,000 |
| Bankers Trust Co. (Visa) | 4,000 |
| Chemical Bank | 9,000 |

The August 3 statement was materially false. Each of the assets is substantially overstated. The figure listed for the capital of Eagle & Fox is identical to that shown on a balance sheet for Eagle & Fox complied by Schmall & Kindman, accountants. The accountants expressed no opinion on the balance sheet and their covering letter indicates that "management has elected to omit substantially all of the disclosures required by generally accepted accounting principles." Bank of Commerce was furnished with a copy of the balance sheet and covering letter at or about the time it received the August 3 balance sheet, but in any event by August 10, 1981. Mr. Ebbin testified unequivocally that the inventory comprising $21,745 of the total capital shown on the statement was shown at its retail value, meaning the price at which it could be sold by a retail store. That price is five times what the inventory cost Eagle & Fox. Eagle & Fox sold only wholesale and had no access to a retail market; its wholesale price was twice the cost to Eagle & Fox.

As more fully discussed below, the $45,000 ascribed to jewelry, furs and home furnishings bears no relationship to either the cost or value of any such goods then owned by the Ebbins. At the Section 341 meeting Mr. Ebbin stated that he did not know where the $45,000 figure came from and that he was convinced that at that time he had "nothing close to that" in personal property. Finally, Mr. Ebbin does not and did not have a fully vested pension plan in the amount or value of $35,000 and Mr. Ebbin does not know what rights and bene-

fits, if any, he has under the Colgate-Palmolive pension plan.

In addition to these errors on the asset side, the balance sheet also was materially deficient on the liability side since an obligation to Chemical Bank in the amount of $10,000 on a commercial note dated June 15, 1981 was omitted. On or about August 20, 1981, this note was repaid or rolled over into a note in the increased amount of $25,000.

Mr. Ebbin testified that the $45,000 figure for the jewelry, furs and home furnishings was supplied by Robert Wall, an officer of Bank of Commerce, and that Mr. Wall had also suggested the pension plan as an asset. Mr. Ebbin further testified that Mr. Wall told him to omit the Chemical Bank commercial loan because "it wouldn't show up any way." Mr. Wall testified at trial and was not asked directly to confirm or deny Mr. Ebbin's testimony. However, Mr. Wall did testify that he did not learn of the Chemical Bank commercial loan until November 1981.

In light of the preparation of the August 3 statement by Mr. Ebbin's accountant from figures supplied by Mr. Ebbin and of a financial statement on an identical form given by Mr. Ebbin to Chemical Bank on August 20, 1981, the court has rejected the suggestion that the errors in the August 3 statement are attributable to Bank of Commerce.

The August 20 statement lists the following assets:

| Cash on hand | $ 2,000 |
| Cash in banks | 2,000 |
| Accounts Receivable | 32,000 |
| Furs | 3,000 |
| Jewelry | 75,000 |
| Furnishings | 20,000 |
| Total Assets | $134,000 |

Total liabilities and net worth is listed as $119,000. The only liabilities listed are Chemical Bank $10,000 and Bank Americard/Visa $5,000.

The August 20 statement makes no reference to Eagle & Fox or the Bank of Commerce borrowings. Mr. Ebbin explained that this was because Eagle & Fox had

been incorporated, at the urging of Bank of Commerce, about August 14. Nevertheless, the jewelry listed at $75,000 is the inventory of Eagle & Fox, again listed at retail value, and the accounts receivable of $32,000 are also those of Eagle & Fox. Mr. Ebbin stated that the difference in value of inventory between the two statements ($21,745 as opposed to $75,000) was attributable to the purchase of approximately $5,000–$6,000 worth of jewelry. His explanation for the source of the furs and furnishings numbers on the second statement ($45,000 on the first and $23,000 on the second) is that the figure was "not scientifically arrived at. It was my estimate if, for instance, the whole place was to burn down." There is no reference to the pension plan.

After being asked at length how and whether these two statements could be reconciled, Mr. Ebbin stated:

"Your honor, I·paid no attention to any relationship between those two forms."

In other words, Mr. Ebbin simply did not care what was on the forms as long as they fulfilled their function as selling documents and permitted him to make the desired borrowings.

Bank of Commerce has stated that on August 5, 1981 it loaned $25,000 to Eagle & Fox. Mr. Ebbin testified that Eagle & Fox did not have the use of this money until early September, when on September 4, the Bank loaned $31,000 to Eagle & Fox. The only evidence adduced on this issue is the Bank's computer printout captioned "Account Liability Ledger." Although that document shows an advance on August 5 of $25,000 that was repaid on September 4, this is not necessarily inconsistent with Mr. Ebbin's testimony.

On September 3, 1983, both Mr. Ebbin and his wife executed an individual continuing guarantee to the Bank of Commerce of the obligations of Eagle & Fox, Ltd. This guarantee was required because of the incorporation of the business and the change in position of Mr. Ebbin from that of a general partner to sole shareholder. Also on September 3, 1983, Emanuel M. Ebbin,

Mr. Ebbin's father, signed and delivered to the Bank a guarantee limited to $35,000. Emanuel Ebbin secured his guarantee with New York Stock Exchange listed stocks having a market value in excess of $35,000, to which the Bank assigned a collateral value of 70% in accordance with standard banking practice. It further appears that the Bank of Commerce required in addition to the collateralized guarantee as a condition to the loan that Eagle & Fox obtain additional capitalization which it did in the form of a $30,000 subordinated loan from Emanuel Ebbin.

Following the $31,000 advance on September 4, the Bank of Commerce made two additional loans of $10,000 each, one on September 18 and one on September 24, bringing the total amount of credit extended to Eagle & Fox, Ltd. to $51,000. The Bank of Commerce also entered into a loan and security agreement on September 16, 1981 pursuant to which Eagle & Fox, Ltd. pledged its accounts receivable on a non-notification basis. This meant that Eagle & Fox retained the full right to collect and utilize the accounts receivable and that the account debtors were not notified of the Bank's interest in the receivables.

According to the Bank's Account Liability Ledger on January 20, 1982, it received principal payments of $15,000, reducing the outstanding loan balance to $36,000. Thereafter on March 29, 1982, the Bank reloaned $15,000 bringing the total loan back up to $51,000.

In November 1982 after Eagle & Fox, Ltd. went out of business, the Bank called the loan because of a default in the payment of interest. Thereafter on November 26, 1982, the Bank received $35,000 benefit from the collateral pledged by Emanuel Ebbin, the maximum amount of his guarantee. This money was applied against the oldest of the notes evidencing the indebtedness, leaving unpaid the $15,000 note representing the March 29, 1982 loan. Four payments to the Bank from accounts receivable further reduced the unpaid principal to $13,923.86.

The Bank never received any further personal financial statements from Mr. Ebbin.

Between September 1981 and April 1982, Bank of Commerce received only sporadic financial statements respecting Eagle & Fox and the accounts receivable. During this period the Bank requested financial information from both Mr. Ebbin personally and from Eagle & Fox which it did not receive.

The loan was evidenced by demand notes, which Bank of Commerce typically used with collateralized loans, rather than the time notes typical of unsecured loans. Because the receivables assignment was non-notification, the Bank did not consider the loan to be fully secured. Mr. Wall on behalf of Bank of Commerce testified that it was standard practice in the banking industry to require personal financial statements in making loans of this type. He stated that the purpose of requiring the personal financial statement was several fold. First, the assets demonstrate whether the individual over the course of his business career has the ability to accumulate assets and furthermore to determine in a new venture, which is frequently undercapitalized, whether the borrower has the wherewithal. Secondly, the liability side is looked at to determine that there is a lack of excessive debt that would keep someone preoccupied with staying a step ahead of the bill collector instead of running the business.

Mr. Wall testified that at the time the $25,000 loan was made in early August to the Eagle & Fox partnership, the Bank relied on the financial statement and on the collateral given to it by Mr. Ebbin's father. He further testified that the Bank would not have lent to Eagle & Fox partnership or the later corporation had it known that there was $40,000 less in assets and $10,000 more in liabilities than shown on Mr. Ebbin's financial statement.

The only attempt that Bank of Commerce made to verify the information contained on Mr. Ebbin's financial statement, other than obtaining the Eagle & Fox balance sheet, was to obtain a TRW report, which reflects only consumer credit extensions and therefore did not and would not reflect the omitted loan. The TRW report is dated September 4, 1981.

## CONCLUSIONS OF LAW

Bank of Commerce bears the burden of proof. It has met the burden of showing that Mr. Ebbin supplied it with a statement in writing that is materially false respecting the financial condition of Mr. Ebbin and his wife and that Mr. Ebbin caused the statement to be made with intent to deceive.

Bank of Commerce has failed to show that the unpaid indebtedness now due to it was incurred as a result of its reliance on the false financial statement. If Bank of Commerce relied on the August 3 financial statement, its reliance was unreasonable.

## DISCUSSION

■ This case presents yet another variant on the eternal conflict confronting the bankruptcy court when confronted with an objection to the dischargeability of a debt under Bankruptcy Code § 523(a)(2)(B) on the grounds of use of a false financial statement to obtain credit. The United States Supreme Court has said that a primary purpose of a discharge in bankruptcy is to

> "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934).

In the general view, a debtor who has utilized a false financial statement to obtain a loan is not honest. However, the honesty required to obtain a general discharge under Bankruptcy Code § 727, 11 U.S.C. § 727, is full and fair disclosure in the bankruptcy case itself about assets and liabilities. No general challenge to Mr. Ebbin's right to a discharge has been made.

Bankruptcy Code § 523, 11 U.S.C. § 523, specifies the circumstances under which a challenge to the dischargeability of a particular debt may be made. The burden of proof is on the creditor. Only if the court finds that each of the elements has been proved can it find the debt nondischargeable. Bank of Commerce seeks to have its

debt declared to be nondischargeable under Bankruptcy Code § 523(a)(2)(B) which provides that a debt

"for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

\*    \*    \*    \*    \*    \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive."

is nondischargeable. The court has found that the August 3 financial statement was materially false, thereby satisfying the requirements of subsection (B)(i) and (ii). The cases make it clear that reckless indifference to the truth is sufficient to prove intent to deceive. *See, e.g., In re Kimberly (Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Kimberly),* 13 B.R. 145, 4 C.B.C.2d 1445, 1446 (Bkrtcy.S.D.Fla.1981) ("When questioned as to each of these [asset] figures, the debtor responded, 'I don't know where I got it.' These representations were materially false and made with such reckless disregard of the truth that the requisite intent to deceive may be imputed."); *In re Archangeli,* 6 B.R. 50, 7 B.C.D. 63 (Bkrtcy. D.Me.1980); *In re Magnusson,* 14 B.R. 662, 8 B.C.D. 708 (Bkrtcy.N.D.N.Y.1981) and *In re Coughlin,* 27 B.R. 632, 10 B.C.D. 266, 268 (Bkrtcy.App. 1st Cir.1983). At a minimum the Bank of Commerce has shown that Mr. Ebbin delivered the August 3 statement with a reckless indifference to the truth such that the court has found an intent to deceive and the requirement of subsection (B)(iv) is satisfied.

The crucial element in this case becomes subsection (B)(iii). The Bank of Commerce must show that it in fact relied on the August 3 statement, that its reliance was reasonable and that it was injured as a result of that reliance. Only the March 29, 1982 note remains unpaid. When the loan went into default, the Bank, in accordance with customary practice, applied the payments received against the oldest notes, leaving the newest one unpaid. This court's decision does not turn, however, on this technicality.

■ As a starting point, the court accepts that the Bank need not show that it relied solely on the financial statement to prevail; partial reliance would suffice. *In re Coughlin,* 27 B.R. 632, 10 B.C.D. 266 (Bkrtcy.App. 1st Cir.1983); *In re Tomei,* 24 B.R. 204, 9 B.C.D. 1166 (W.D.N.Y.1982). The court has considered the total series of events between August 1981 and April 1982. It is apparent that the Bank of Commerce did not in fact rely on the August 3 financial statement in extending any credit, except possibly the August 5 advance, which assuming it was made was in any event repaid September 4, and is therefore irrelevant. All the circumstances surrounding the September 4 loan negate reliance on the August 3 statement.

■ The Bank's conduct in insisting on incorporation, a collateralized guarantee from Emanuel Ebbin, an additional capital investment and a security interest in receivables indicate an absence of reliance on the August 3 financial statement. In other words, the Bank evaluated the information on the statement negatively and chose to obtain assurance of repayment in another fashion. Although the Bank of Commerce insisted on a written guarantee after the incorporation in order to secure the Ebbins' continued devotion to the business, the Bank was not induced to take that guarantee by the August 3 financial statement. Just as actual reliance may be proved by circumstantial evidence, circumstantial evidence may disprove an assertion of reliance. Compare, *In re Kreps,* 700 F.2d 372, 10 B.C.D. 308 (7th Cir.1983).

The March 1982 $15,000 loan becomes the critical issue because if that loan had not been made no loss would have been sustained by the Bank since the collateral pledged to it by Emanual Ebbin was sufficient to repay the open loan. Although the August 3 statement states that it is a continuing financial statement, the Bank actually knew by November 1981 that either the

statement was false when given or that a significant debt had since been incurred. The Bank of Commerce did not insist on a bring down certificate from Mr. Ebbin on September 4 or in March and thus seek to verify its continued accuracy. Nor does it appear that the Bank undertake any investigation of the non-Eagle & Fox assets. As to the Eagle & Fox assets, the accountant's covering letter clearly reveals the need for further inquiry. There is no allegation that Mr. Ebbin thwarted such an inquiry. Mr. Ebbin's candor at trial on the inventory valuation suggests that an inquiry at that time would have received a like response. These factors combined with the Bank's failure to obtain requested financial information render any continued reliance on the August 3 statement in March 1982 unreasonable. *See In re Patch,* 24 B.R. 563, 9 B.C.D. 1269 (D.C.Md.1982) (Reliance unreasonable if creditor knows information is not accurate, statement contains insufficient information to portray realistic financial status, creditor's investigation suggests statement is false or incomplete or, under some circumstances, when creditor fails to investigate); *In re Archangeli,* 6 B.R. 50, 7 B.C.D. 63 (Bkrtcy.D.Me.1980) (no reliance found when Bank failed to verify sources of income listed).

"The creditor's reliance required by the Bankruptcy Act, however, is narrowed by the additional need for reasonable reliance under the Code, thus codifying a strong line of recent case law that read the word 'reasonable' into the old reliance requirement. Those cases typically involved situations in which creditors claiming reliance on a false financial statement were shown to have often more accurate information available, such as credit reports or prior credit applications so that it was not reasonable for them to rely on the false statement. Since the purpose of the exception is to protect creditors who are actually misled by fraudulent statements of debtors, the requirement that reliance be reasonable is sensible. A creditor who ignores available information, or who fails to seek information from sources that are commonly used, should not be heard to complain about the debtor's fraud. It is the creditor's failing to comport with normal business practices, not the debtor's fraud, that is the true cause of the loss." Zaretsky, *The Fraud Exception to Discharge Under the New Bankruptcy Code,* 53 Am.B.L.J. 253, 261–2 (1979).

*See also Gerdes v. Lustgarten,* 266 U.S. 321, 45 S.Ct. 107, 69 L.Ed. 309 (1924) for its extensive discussion of the issue of the right to rely on a financial statement over a period of time because of continuation language contained in the statement. This court notes that in rendering its opinion that it has not undertaken to second guess the credit decision made. Rather it has attempted to determine how that decision was in fact made. The reasonableness of reliance is not a judgment as to the merits of the credit decision. *See In re Garman,* 643 F.2d 1252 (7th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981).

Settle judgment in accordance with this opinion.