United States Court of Appeals,

Fifth Circuit.

No. 91–2729.

In the Matter of Dale Leonard MARTIN, Debtor.

FIRST NATIONAL BANK LaGRANGE, Appellant,

v.

Dale Leonard MARTIN, Appellee.

June 24, 1992.

Appeal from the United States District Court for the Southern District of Texas.

Before WILLIAMS and WIENER, Circuit Judges, and LITTLE,[*] District Judge.

JERRE S. WILLIAMS, Circuit Judge:

Dale Martin filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code. In response, First National Bank of LaGrange attempted to have several loans it had advanced to Martin declared nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (B) as having been obtained through fraud. The bankruptcy court ruled that the loans were dischargeable, finding no fraud. The district court affirmed. First National Bank of LaGrange appeals, claiming the bankruptcy court's findings of fact were clearly erroneous, and t he bankruptcy court erred in not allowing one of the bank's witnesses to testify.

I. FACTS

Dale Martin, an experienced businessman, moved to Round Top, Texas, in 1984 and established a business relationship with First National Bank of LaGrange ("FNBL") and its president, Virginia Schroeder. Martin initially made a deposit of approximately $550,000 in proceeds from the sale of his business and his house in Houston. Although Martin withdrew the deposits within several months, FNBL claims the deposit demonstrated Martin's liquidity and served as a prelude for his requests for loans from FNBL.

[*]District Judge of the Western District of Louisiana, sitting by designation.

From January 1985 to July 1987, Martin obtained nine loans from FNBL totalling nearly $400,000. One of the loans was a nonrecourse loan to purchase Lone Star Boat Company, an unsuccessful business Martin hoped to revive. FNBL claims it extended these loans to Martin partly due to his strong financial position as indicated in the financial statements he submitted to the bank in September 1984, January 1985, August 1985, October 1986, and January 1988. Martin's financial statements listed his net worth as $1,666,000.00, $3,916,000.00, $2,283,000.00, $2,394,400.00, and $1,723,200.00, respectively. FNBL alleges the financial statements, as well as Martin's oral representations, were fraudulent.

FNBL claims Martin misrepresented facts with respect to the following assets:

1. Oil and Gas Properties—Martin inherited oil and gas properties from his parents. FNBL claims he grossly overestimated the value of these properties because he used undiscounted future net revenues as the value of these properties. FNBL alleges that no experienced businessman would use this figure unless he intended to deceive the bank. Moreover, in January 1985, Martin transferred his oil and gas property interest to an irrevocable trust naming his children as the sole beneficiaries. He continued, however, to include the properties on his financial statements.

2. Securities—Martin listed securities worth more than $500,000 on his financial statements but did not reveal that the securities were his wife's sole asset.

3. Residence—Martin listed the value of his residence at $500,000–$550,000 although it was appraised for taxes at $207,000.

4. Johnnie Irwin Judgment—In 1987, Johnnie Irwin obtained a judgment in excess of $350,000 against Martin. Martin, however, did not list this liability on his 1988 financial statement.

5. Debts to Union Commerce Leasing and Allied Bank—Martin owed approximately $100,000 to Union Commerce Leasing, and he was a guarantor on a $2,000,000 loan from Allied Bank. He never listed either liability on his financial statement. Furthermore, on his January 1988 financial statement, he listed a potential multimillion dollar lawsuit as an asset. He informed FNBL that he would use the potential proceeds from the lawsuit to repay his debt, but, in reality, he had already assigned his rights to the proceeds to cover the prior debts.

6. Oral Misrepresentations—In 1987, Schroeder and Joe Pritchett, the new FNBL president, requested that Martin secure some of his loans by pledging his Lone Star Boat Company stock. Martin refused to do this claiming the other stockholders would not approve of the stock pledge. Schroeder and Pritchett later learned Martin owned one hundred percent of the stock.

7. Life Insurance—Martin assigned certain term life insurance policies as security for notes FNBL renewed in 1988. Martin warranted that he would not interfere with FNBL's interest in this collateral. Nevertheless, without informing FNBL, Martin allowed the policies to lapse.

Martin ultimately defaulted on four unsecured notes with a combined value of over $130,000. Martin had renewed these notes several times, the last such renewal being June 1, 1988. Martin paid a small portion of the debt, and he assigned life insurance policies to FNBL in exchange for the final renewal. FNBL concedes that at the time of this renewal, it was aware of Martin's alleged misrepresentations on his earlier financial statements.

Martin continued to fail making his payments, and FNBL filed suit. On June 9, 1989, FNBL obtained a judgment of $133,428.00 with interest, costs, and attorneys' fees. On August 22, 1989, Martin filed for relief under Chapter 7 of the United States Bankruptcy Code. On October 6, 1989, FNBL sought to have the nonrecourse note and the judgment excepted from discharge because of Martin's alleged fraud in obtaining the funds.

At the September 1990 trial, Martin testified concerning his alleged misrepresentations. He claimed the financial statements he submitted to FNBL were family financial statements, which explains why he included both his wife's securities and the oil and gas interests in his children's trusts on the statements. He testified that he explained to Keith Adams, a loan officer at the bank, that he was submitting a family financial statement. Moreover, Martin maintained he also told Adams of both his wife's sole ownership of the securities and his intent to transfer the oil and gas properties to his children's trust.

Evidence at trial established Martin's inexperience in the oil and gas industry. The figure he provided on his financial statement for his interest in the oil and gas property was equivalent to the undiscounted future net revenues. The undiscounted future net revenues was one of many values contained in a report by Exploitation Engineering, Inc. appraising the value of the properties. The report did not instruct which value to use, nor did FNBL provide guidance as to what value it wanted.

Moreover, Martin did not represent to the bank that he was providing it with the oil and gas properties' fair market value.

Regarding Martin's residence, Schroeder and Pritchett testified they were aware of the Texas homestead exemption but believed some debtors will voluntarily sell their homestead to satisfy their debts. In any event, Martin stated he did not think he overvalued his residence. Although the tax appraisal was much lower than his appraisal, the tax appraisal was low because his property was subject to an agricultural exemption. Moreover, Martin's appraised value included the nearly $300,000 of improvements he had put into the house.

Throughout his testimony, Martin further rebutted FNBL's misrepresentation claims. According to Martin, he informed Schroeder and Pritchett about the claims against him in 1988. Martin also believed he was not personally liable on the debt to Irwin. He believed it was only a corporate debt because he thought he had personally been released from the debt when he sold his corporation in Houston. He later learned he was mistaken about the release. Finally, when he told Pritchett he could not pledge the Lone Star Boating Company stock, the statement was true because he was using a portion of the stock to entice Cal French, former owner of the company, back to the company. If Martin pledged the stock, he could no longer use it as an enticement.

The bankruptcy court credited Martin's testimony. It ruled in his favor, holding that the debts to FNBL were dischargeable. The bankruptcy court found that "[FNBL] has failed to show by a preponderance or by clear and convincing evidence that [Martin] intentionally misrepresented any entries or numerical data on any of his various financial statements or other financial documents delivered to the Bank.... [Martin] was not reckless or grossly negligent in establishing the various values used on his financial statements, or other financial documents provided to the Bank."

The bankruptcy court specifically found that Martin had informed Keith Adams of much of

the information FNBL claims it did not know. The court further noted that neither party had called Adams as a witness either to confirm or to refute Martin's testimony. The court additionally found Martin did not mislead FNBL into believing the oil and gas appraisal was based on fair market value. Regarding Martin's residence, the court held that FNBL could not rely upon its value because of the homestead exemption. The court also was unconcerned with Martin's allowing the life insurance to lapse because they were term life insurance policies, which were of no value to FNBL during Martin's lifetime. Finally, the bankruptcy court held Martin's refusal to pledge the Lone Star Boat Company stock was irrelevant because FNBL already had a lien on all the company's assets, and the company appeared to have no value.

FNBL appealed the bankruptcy court's decision to the district court. On June 12, 1991, the district court affirmed the bankruptcy court's findings of fact and conclusions of law. The district court further held, "Even if Martin fraudulently procured the original loan through material misrepresentations on his financial statements, the bank waived its claim of fraud when it renewed the notes after it was fully aware of the inaccuracies on Martin's financial statements." FNBL now appeals to this Court.

## II. SUFFICIENCY OF THE EVIDENCE

The Bankruptcy Code provides several exceptions to the dischargeability of debts. FNBL asserts that some of Martin's debts should not be dischargeable in bankruptcy under 11 U.S.C. § 523(a)(2)(A) and (B)[1] because he fraudulently procured the original loans. Debts falling within

---

[1]A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual from any debt—

    ...

        (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

            (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]

section 523(a)(2)(A) are debts obtained by frauds involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made. *Matter of Foreman,* 906 F.2d 123, 127 (5th Cir.1990). Similarly, for a debt to be nondischargeable under section 523(a)(2)(B), the debtor must have intentionally deceived the creditor.

FNBL now asks us to reverse the express finding of the bankruptcy court that FNBL "failed to show by a preponderance or by clear and convincing evidence that [Martin] intentionally misrepresented any entries or numerical data on any of his various financial statements or other financial documents delivered to the Bank." The bankruptcy court properly applied the preponderance of evidence standard on the nondischargeability issue. *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). In reviewing the bankruptcy court's findings, both the district court in its appellate function and this Court will not set aside the findings of fact unless they are clearly erroneous. Bankruptcy Rule 8013;[2] *Matter of Jordan,* 927 F.2d 221, 223–24 (5th Cir.1991); *Matter of Luce,* 960 F.2d 1277, 1280 (5th Cir.1992). The Supreme Court has clarified this standard:

This standard plainly does not entitle a reviewing court to reverse the finding of the trier of

---

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied;  and

(iv) that the debtor caused to be made or published with intent to deceive;  ...

11 U.S.C. § 523(a).

[2]"On an appeal the district court or bankruptcy appellate panel may affirm, modify or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Bankruptcy Rule 8013.

fact simply because it is convinced that it would have decided the case differently.... If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).[3]

The bankruptcy court based its findings of fact largely upon Martin's own testimony. Martin provided an explanation for all his actions, and the bankruptcy court manifested its belief in his testimony. The determination as to credibility of a witness is within the province of the bankruptcy judge—i.e. the trier of fact. *In re Anderson,* 936 F.2d 199, 204 (5th Cir.1991) ("The bankruptcy court is in the best position to judge the credibility of any witness who testifies under oath before it ..."); *Matter of Texas Mortgage Services Corp.,* 761 F.2d 1068, 1078 (5th Cir.1985) ("We will not attempt to reassess the credibility of witnesses whom we have not had an opportunity to see on the stand").

The bankruptcy judge had occasion to observe Martin and to listen to his testimony, which necessarily includes the opportunity to study any changes in both his demeanor and tone of voice. This opportunity places the bankruptcy judge in a far superior position to gauge Martin's credibility than this Court is in by merely reading the transcripts. If the bankruptcy judge finds one version of events more credible than other versions, this Court is in no position to dispute the finding. Consequently, we hold that the bankruptcy court's findings of fact are not clearly erroneous.

### III. INVOKING THE RULE

FNBL claims the bankruptcy court also erred by refusing to allow one of its witnesses, Johnnie Irwin, to testify. At trial, Martin testified, apparently to FNBL's surprise, that he erroneously

---

[3]Although *Anderson* concerned a federal appellate court's review of a district court decision, it is equally applicable to a review of a bankruptcy court's decision. *Matter of Webb,* 954 F.2d 1102, 1104 (5th Cir.1992).

had believed he had been released of his debt to Irwin. FNBL attempted to call Irwin as a rebuttal witness to show both that Martin committed perjury and that Martin acted fraudulently in not revealing this financial liability to FNBL. Martin objected to FNBL calling Irwin to testify because the court had invoked "the Rule" requiring witnesses to remain out of the courtroom when not testifying.[4] Irwin had been seated in the courtroom throughout the trial. The bankruptcy judge agreed with Martin and refused to allow Irwin to testify.

FNBL argues it could not have anticipated that Martin would lie on the stand. FNBL wanted to call Irwin only to rebut Martin's claims, and Irwin's presence in the courtroom would not have influenced his testimony.

We first note FNBL's failure amply to demonstrate that Martin lied on the stand. Mr. Martin did not testify that he owed no money to Irwin. Instead, he stated that due to the sale of his corporation, he believed he was released from his obligation on the debt and that the debt was only a corporate debt. He later learned he had not been released from his obligation. FNBL expected Irwin to testify that Martin was personally liable on the debt. Irwin's anticipated testimony, therefore, would not refute Martin's claim that he erroneously believed he was no longer personally liable for the debt.

More important, the bankruptcy judge has discretion in allowing a rebuttal witness who has violated the Rule to testify for impeachment purposes. FNBL must show that the bankruptcy judge abused her discretion, causing sufficient prejudice to FNBL. *United States v. Wylie,* 919 F.2d 969, 975 (5th Cir.1990); *see also, United States v. Hargrove,* 929 F.2d 316, 320–21 (7th Cir.1991);

---

[4]"At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rules does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause." Fed.R.Evid. 615.

*United States v. Shurn,* 849 F.2d 1090, 1094 (8th Cir.1988).

We hold that the bankruptcy judge did not abuse her discretion in refusing to allow Irwin to testify. Martin testified that he did not believe he was personally liable on the debt. In its findings of fact, the bankruptcy court acknowledged that Irwin obtained a judgment against Martin in June 1987. The court found, however, that Martin listed the obligation as a liability on his January 1988 financial statement, although the debt was not expressly classified as the "Johnnie Irwin Judgment." Because the bankruptcy court considered the debt in question in reaching its decision, the judge did not abuse her discretion, and FNBL was not prejudiced.

## IV. OTHER ISSUES

The parties address two other issues, which we need not resolve. The first issue is whether a bank waives its fraud claim when it renews notes after it becomes aware of inaccuracies on previous financial statements. The district court explicitly held that FNBL waived its claim upon renewal. FNBL claims banks should not be penalized for trying to work with the debtor instead of bringing suit and possibly forcing the debtor into bankruptcy.[5] FNBL maintains the fraud has already occurred and the bank has already loaned the money. The bank is merely trying to make the best of a bad situation.

This is an issue unresolved in decisions of the Fifth Circuit. The other circuits that have addressed the issue are split. *Compare, In re Liming,* 797 F.2d 895 (10th Cir.1986) (holding that lenders "should not be penalized for accepting part payment and extending the date by which the loan must be repaid in an apparent effort to keep the [debtor] afloat"); and *In re Allen,* 65 B.R. 752 (Bankr.E.D.Va.1986) (distinguishing cases in which new, or "fresh," cash is extended and cases in which a pre-existing loan is merely renewed); *with In re Archangeli,* 6 B.R. 50 (Bankr.D.Me.1980)

---

[5]The Texas Bankers Association and the Independent Bankers Association of Texas filed amicus curiae briefs in support of FNBL's position on this issue.

(holding that a creditor waives his claim of fraud when he knows of misrepresentations at the time of renewal because he cannot rely upon those misrepresentations).

The parties also debate whether a non-recourse debt obtained by fraud is nondischargeable. FNBL maintains that the use of fraud in obtaining the loan compels us to characteri ze the loan as nondischargeable. Martin, on the other hand, asserts that, by definition, a debtor is not liable on a non-recourse loan, and, therefore, the bank should not be able to look to the debtor for satisfaction of the loan after bankruptcy.

We do not address either issue. To do so would be mere dicta. We affirm the bankruptcy court's findings of fact that Martin did not obtain the loans by fraud through intentionally misrepresenting any figures on his financial statements. It is, therefore, hypothetical and irrelevant to consider what our ruling would be if Martin had fraudulently obtained the loans and then renewed them or if Martin fraudulently obtained a non-recourse loan. Although the bankruptcy court and the district court addressed these issues, they need not have done so.

## V. CONCLUSION

The bankruptcy court's decision, finding Martin's debts dischargeable in bankruptcy, was properly affirmed by the district court. The findings of fact were not clearly erroneous, and the refusal to allow Irwin to testify was not an abuse of discretion. We set aside the district court's holding that renewal of a loan subsequent to learning of misrepresentations waives a bank's claim for fraud. Because fraud was not proved in the case, the district court unnecessarily confronted this issue.

AFFIRMED.