**In re Michael F. MOORE and Linda L. Moore, Debtors.**

**WOMENS BUSINESS INITIATIVE CORP., Plaintiff,**

**v.**

**Michael F. MOORE and Linda L. Moore, Defendants.**

**Bankruptcy No. 96-28454-JES.**
**Adversary No. 97-2026.**

United States Bankruptcy Court, E.D. Wisconsin.

Jan. 27, 1998.

John D. Wartman, Milwaukee, WI, for Plaintiff.

Vicki S. Bors, Milwaukee, WI, for Defendant.

Patrick K. Noonan, Milwaukee, WI, trustee.

**DECISION**

JAMES E. SHAPIRO, Chief Judge.

*PROLOGUE*

Where have you gone, Ken Maynard?

When I was a kid, my big treat was to go to the neighborhood movie theater each Saturday afternoon where, for under $1, I saw two features, the coming attractions, one or (if lucky) two cartoons, and a western serial. But the western serial alone was worth the price of admission. My all time favorite cowboy was Ken Maynard. He may not have been as popular as others during that era, such as Gene Autry or Johnny Mack Brown, but with his two silver pistols blazing, his white hat, and riding on top of his trusted horse, Tarzan, Ken Maynard was my hero. I liked him because he was the defender of the downtrodden. Although he always had his hands full, fighting for law and order, I knew that, in the end, justice would prevail and that all would be right in the world (at least until the following Saturday).

That was another time. Unfortunately, the story in this case does not have such a happy ending.

*FACTS*

Oak Specialties, Inc. was a corporation which manufactured office furniture. One of the debtors in this case, Michael Moore, was its sole stockholder. His wife and co-defendant-debtor, Linda Moore, was its secretary. However, Linda Moore had no active role in the operation of this business and never received a salary. Oak Specialties was purchased by Mr. Moore in the early part of 1994. On February 1, 1996, Mr. Moore, on behalf of Oak Specialties, applied for a loan from Womens Business Initiative Corp. ("WBIC"), a non-profit development corporation which makes small loans to small businesses—primarily to women and to minorities. The maximum amount of any loan made by WBIC was $25,000.

On February 1, 1996, Mr. Moore prepared and submitted to WBIC a loan application on behalf of Oak Specialties. Previously, Mr. Moore unsuccessfully attempted to obtain a loan for Oak Specialties from several other lending institutions. Among the documents he forwarded to WBIC was his personal financial statement. The financial statement was signed by Mr. Moore but not by Mrs. Moore. WBIC approved the loan. On May 3, 1996, the loan closing took place, and WBIC provided $23,274 in funds through a series of five checks payable to Oak Specialties and to various of its creditors. Mr. and Mrs. Moore both personally guaranteed this loan. No collateral was obtained by WBIC for this loan.

Oak Specialties defaulted on the loan and, in August of 1996, went out of business—approximately three months after the loan was obtained. No portion of the $23,274 loan was ever repaid. All of Oak Specialties assets were liquidated by Firstar Milwaukee N.A., another creditor which made a separate $25,000 loan to Oak Specialties at the same time the loan was made by WBIC. Unlike WBIC, however, Firstar's loan was secured by all of Oak Specialties assets, by a mortgage on the Moores' home, and by a security interest in the cash surrender value of the Moores' insurance policies.

After Oak Specialties' default, WBIC sought recovery from Mr. and Mrs. Moore on their personal guarantees. However, on October 15, 1996, the Moores filed bankruptcy under chapter 7 and listed WBIC as an unsecured creditor in the sum of $23,274.

This adversary proceeding followed, in which WBIC seeks a determination that the debt due it from the Moores is nondischargeable under 11 U.S.C. § 523(a)(2)(B),[1] based

1. § 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

upon its assertion of a false financial statement.

At the trial, WBIC pointed out certain disparities in the assets and liabilities of the Moores as between the February 1, 1996 financial statement provided to it by Mr. Moore and the Moores' bankruptcy schedules filed approximately nine months later on October 30, 1996. These differences are as follows:

| | Financial Statement (February 1, 1996) | Bankruptcy Schedules (October 30, 1996 *) |
|---|---|---|
| **Assets—** | | |
| Residence at 914 East Bay Point Road, Bayside, Wisconsin | $250,000.00 | $200,000.00 |
| Life insurance — cash value | 11,000.00 | 2,581.00 |
| Automobiles | 20,000.00 | 12,900.00 |
| Miscellaneous personal property (consisting of oriental rugs, oil paintings, antiques, and jewelry) | 42,000.00 | 18,000.00 |
| **Debts—** (** Of this amount, $22,000 consisted of personal debts; $180,000 home mortgage; and $2,000 accounts payable) | $204,000.00 ** | $416,071.08 |
| **Income—** | | |
| Annual salary of Michael Moore | $ 45,000.00 | $ 6,000.00 (This covers the period of January 1, 1996 to October 29, 1996 and includes the salaries of both Mr. and Mrs. Moore.) |

* Although the Moores filed their bankruptcy petition on October 15, 1996, their bankruptcy schedules were filed on October 30, 1996.

## *ANALYSIS*

[1] 11 U.S.C. § 523(a)(2)(B) requires that all of the following elements be established in order to except an obligation from discharge:

1. the existence of a statement in writing;
2. such writing must be materially false;
3. such writing must concern the debtor's financial condition;
4. it must be a statement upon which the creditor reasonably relied; and
5. the statement was made with intent to deceive.

*In re Blatz,* 37 B.R. 401, 403 (Bankr.E.D.Wis. 1984) (aff'd 67 B.R. 88 (E.D.Wis.1986)). *See also In re Jones,* 88 B.R. 899, 902–903 (Bankr.E.D.Wis.1988), and *In re Harasymiw,* 895 F.2d 1170, 1172 (7th Cir.1990). Each of these elements must be proven by the party seeking to except a debt from discharge by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 283–91, 111 S.Ct. 654, 657–61, 112 L.Ed.2d 755 (1991).

[2] Exceptions to discharge are to be construed strictly against the creditor and liberally in favor of the debtor. *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *In re Zarzynski,* 771 F.2d 304, 306 (7th Cir.1985). In this case, the first three elements under § 523(a)(2)(B) and set forth above were irrefutably proven. The elements in dispute are "intent to deceive" and "reasonable reliance."

## *INTENT TO DECEIVE*

[3] I find that there was an intent to deceive by Mr. Moore. He is not a naive individual. He has a solid, business back-

(2) for obtaining money, property, services, or an extension, renewal, or refinance of creditor, to the extent by—
(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

ground. Mr. Moore is an attorney who had been in private practice, which included dealings in general business transactions. He also worked for Koss Corporation, the world's largest producer of stereo phones. He was its credit manager and, eventually, became its inhouse legal counsel. As an attorney, he knew full well the importance and consequences of a financial statement. He has failed to satisfactorily explain the substantial differences between his financial statement and the bankruptcy schedules with respect to his assets and also with respect to his reported salary.[2]

I believe that when he completed his financial statement on February 1, 1996, Mr. Moore was financially desperate and knowingly inflated the values of his assets. This is shown by the following:

1. Real estate. There was no satisfactory explanation for the $50,000 drop in the value he placed on his home in the bankruptcy schedules from what he had previously listed on the financial statement (i.e., from $250,000 to $200,000). Mr. Moore attempted to explain this discrepancy in a variety of ways—none of which was persuasive. At one point in time, he stated he thought he was only required to place a liquidation value on the schedules, when the bankruptcy schedules specifically state fair market value should be utilized. He also claimed that there was substantial deterioration in the real estate. I find this hard to believe. He also claimed that the reason he placed a $200,000 value on his home in the bankruptcy schedules is because of a $200,000 appraisal he obtained in 1990 when he refinanced his home mortgage. Yet, that does not explain why he placed a figure of $250,000 on his home in his financial statement, which was also subsequent to when the $200,000 appraisal was obtained.

2. Personal property. No clear reason was given by Mr. Moore for the drop in value of approximately $9,000 from the amount shown on his financial statement to the amount shown on his bankruptcy schedules. The oil paintings and jewelry alone were listed in his financial statement at $27,000 and were subsequently listed in the bankruptcy schedules at $8,000. Mr. Moore testified that, when he was unemployed, he sold some rugs at a yard sale. He did not, however, sell any jewelry or oil paintings.

3. Life insurance. Mr. Moore stated the reduction in cash value was the result of applying the life insurance cash value to the monthly life insurance premiums as they became due after February 1, 1996. This still left unaccounted approximately $4,000.

In addition to the glaring disparities in assets, Mr. Moore also listed his annual salary on his financial statement at $45,000. In fact, the total combined salary which both he and his wife received in 1996 (from the beginning of the year to the date of the filing of his bankruptcy petition) was $6,000. He said that the $45,000 annual salary on the financial statement was based upon his "projected salary" which, if he had in fact received and cashed all his checks, would have been accurate. At the time he filed his financial statement, he admitted having in his possession approximately 10 or more payroll checks which he could not cash due to a lack of funds in the Oak Specialties checking account. Mr. Moore had a responsibility to reveal this information to WBIC but failed to do so.

The court is persuaded that there was clearly an intent to deceive by Mr. Moore.

*RELIANCE*

There was no reliance at all by WBIC—reasonable or otherwise—upon the financial statement. It was not necessary for WBIC to demonstrate that the financial statement was the only factor in influencing its decision to make the loan to Oak Specialties. Here, however, it played absolutely no part in WBIC's decision to provide the requested funds to Oak Specialties. What hap-

2. There were also marked differences with respect to the liabilities which were listed on the financial statement and bankruptcy schedules. However, Mr. Moore testified that, on advice of his bankruptcy counsel, he listed on his bankruptcy schedules (but not on the financial statement) some promissory notes of Oak Specialties, which he signed on its behalf, as a precaution against creditors later attempting to pierce the corporate veil. I find this to be a plausible explanation.

pened in this case is comparable to *In re Dammen,* 167 B.R. 545 (Bankr.D.N.D.1994), where the court, in rejecting a claim of nondischargeability, stated, 167 B.R. at 553:

> The inescapable conclusion in this case is that Financial Statements were not taken with any serious purpose of relying upon them to any significant degree, but merely ceremonial devices routinely obtained perfunctorily as a part and parcel of the original loan transactions.

WBIC approved this loan because of its reliance upon other factors, including the presumed "family wealth" of the Moores and Mr. Moore's law degree. Kathryn Cairney, the former vice president of WBIC and the loan officer who processed and closed the loan to Oak Specialties, stated that she was relying upon the fact that Mr. Moore was an attorney. Ms. Cairney testified that she believed Mr. Moore "could go back and get a job if the business failed and earn income that would allow him to repay the loan." Ms. Cairney further stated that she was also relying on the fact that Firstar at that same time made a separate loan to Oak Specialties. She acknowledged that, if Firstar had not made the loan, WBIC also would not have made the loan. I am aware that Ms. Wendy Werkmeister, president of WBIC, testified that WBIC "relied" on the financial statement. She did not, however, provide any substantiation for this self-serving assertion. Just as I have never heard a debtor declare in court that he or she committed a fraud, I also never heard a creditor say in court that he or she did not rely on the financial statement. Ms. Werkmeister's testimony in this regard is unconvincing.

What WBIC did not do is also significant and persuades this court that it placed absolutely no reliance upon the financial statement. It never sought to verify any of the information contained in the financial statement despite Ms. Werkmeister's acknowledgment that: "to us, this is a very large loan.". It did not even undertake an inexpensive and simple UCC search upon the Moores. It failed to check out the purported values of any of the assets listed in the financial statement. It did not order an appraisal on the real estate or upon the personal property. WBIC's reliance upon her impression of Mr. Moore rather than upon his assets is also borne out by Ms. Cairney's testimony when she stated that she felt "he was being honest with me when he was telling me about his history and his background." WBIC's lack of reliance upon the financial statement is also evidenced by Ms. Cairney's testimony that she spent "maybe a half an hour or an hour reviewing it" but did nothing further to check out its authenticity.

Reliance upon Mr. Moore's future earning capacity or upon the impression he made to WBIC is not the same as reliance upon financial information set forth in his financial statement. Although the loan application of WBIC contains a specific provision which authorized WBIC "to make the necessary and reasonable inquiries regarding the financial information provided," no inquiry was ever made. Although WBIC's internal procedures included a requirement for obtaining a financial statement, this was a mere formality.

■ Just as actual reliance may be proven by circumstantial evidence, lack of actual reliance can also be proven by circumstantial evidence. *See In re Ebbin,* 32 B.R. 936, 941 (Bankr.S.D.N.Y.1983).

■ Even, for the sake of argument, if actual reliance had been proven, it was clearly unreasonable. This was shown by the lack of any verification of the information contained in the financial statement and by the further fact that this was a first-time business dealing between these parties. Reasonableness of a creditor's reliance must be evaluated according to the particular facts and circumstances in a given case. *In re Mullet,* 817 F.2d 677, 679 (10th Cir.1987). WBIC never acquired any collateral. Due to a mix-up, it also failed to follow through with obtaining a guarantee from the Milwaukee Department of City Development, which it could have obtained for 50% of this loan. When WBIC's efforts to subordinate the outstanding notes which the Moores owed to family members and friends were refused—including a $15,000 obligation due to John Koss, the father of Linda Moore—this should have been a tip-off that WBIC's dependence upon

the Moores' "family wealth" was not well founded and that something was awry. I am persuaded WBIC's actions were so unreasonable as to amount to no actual reliance at all. *See In re Garman,* 643 F.2d 1252, 1255–56 (7th Cir.1980) cert. denied, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981); *In re Phillips,* 804 F.2d 930, 933 (6th Cir.1986).

Because of the failure to show not only reasonable reliance but actual reliance, § 523(a)(2)(B) has not been proven against Mr. Moore.

*LINDA MOORE'S ROLE*

Linda Moore's role presents an even clearer case than that of her husband for not excepting from discharge her obligation as a guarantor to WBIC. She did not sign the financial statement. She was not instrumental in completing the financial statement, although she did read it over. Moreover, even if there was an intent by her to deceive, the lack of any reliance by WBIC doomed its case against her, as it does against her husband.

*EPILOGUE*

If I lived in the world of Ken Maynard, I'd know how to write a proper ending to this story. I'd whip out my silver pistols and eliminate "reliance" as a necessary requirement for proving nondischargeability under § 523(a)(2)(B). But we live in a world far different from that of my favorite cowboy, and I am obliged to recognize all of the requirements in § 523(a)(2)(B). While the equitable powers of a court encourage it to be innovative, even original, these equitable powers are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules. *In re Olson,* 120 F.3d 98, 102 (8th Cir.1997) (citing *Official Comm. of Equity Sec. Holders v. Mabey,* 832 F.2d 299, 302 (4th Cir.1987)). WBIC was required to prove reasonable reliance and, unfortunately, could not do so. Sometimes, the good guys (in this case, meaning WBIC) must bite the dust.

This decision shall stand as and for findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 of the Federal Rules of Bankruptcy Procedure.