**In re Keith A. DAMMEN and Julie M. Dammen, Debtors.**

**RAMSEY NATIONAL BANK & TRUST CO., Plaintiff,**

v.

**Keith A. DAMMEN, Defendant.**

**Bankruptcy No. 93–30334.
Adv. No. 93–7056.**

United States Bankruptcy Court,
D. North Dakota.

Jan. 4, 1994.

ble income provision." *In re Kuhlman,* 118 B.R. 731, 738 (Bankr.D.S.D.1990).

Leo Broden, Devils Lake, ND, for plaintiff.

Todd A. Schwarz, Devils Lake, ND, for debtor/defendant.

## MEMORANDUM & ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The plaintiff-creditor, Ramsey National Bank & Trust Co. (Bank), commenced the above-entitled adversary proceeding by complaint filed July 27, 1993, seeking a determination that outstanding indebtedness which arose from two unsecured loan transactions was nondischargeable pursuant to section 523(a)(2)(B) of the Bankruptcy Code. The defendant-debtor, Keith A. Dammen (Dammen) interposed a general denial of the material allegations set forth in the plaintiff's complaint and, in turn, seeks the recovery of all costs and attorney fees incurred in connection with the proceeding pursuant to 11 U.S.C. § 523(d).

Trial was held on November 23, 1993. From the evidence presented, the court finds the facts set forth herein material to resolution of this case and makes the following conclusions of law:

## FINDINGS OF FACT

Keith A. Dammen was engaged in a family farming operation with his father who, perhaps ironically in light of the facts and parties in this case, happened to be on the Board of Directors of Ramsey National Bank & Trust Co. In an effort to at least partly finance the farming operation, Dammen contacted the Bank with the hopes of procuring funding.

On March 4, 1988, Ramsey National Bank & Trust Co. entered into an unsecured loan transaction with Keith A. Dammen whereby the Bank advanced $12,000.00 to Dammen. The transaction was evidenced by a promissory note executed by Dammen which provided for an annual percentage rate of twelve percent (12%). On May 11, 1989, the Bank made an additional unsecured loan to Dammen in the amount of $14,000.00 which was also evidenced by an executed promissory note and provided for an annual percentage rate of thirteen and one-half percent (13.-5%).[1]

The notes were renewed on a yearly basis whereby any outstanding indebtedness would apparently be merely rolled over and the maturity dates would be extended.[2] Although the Bank did not require Dammen to submit a financial statement in connection with the *extension* of credit with respect to either of the notes, it did require Dammen to submit a financial statement of sorts in connection with the yearly *renewals*.[3] The notes were renewed on three separate occasions. In each instance, Dammen completed and signed a pre-printed form (Financial Statement) provided by the Bank which called for a variety of financial information—February 24, 1989, March 5, 1990, and March 1, 1991. (*See* Exhibits 8, 7 & 1 respectively). The Financial Statements were usually completed at the desk of the Bank's loan review officer and took approximately fifteen minutes to complete. Moreover, the loan review officer even assisted Dammen in preparing the Financial Statements by advising Dammen what to disclose and, based on their discussions, actually completed portions of the Financial Statements herself.

Dammen was told, or at least was under the impression, that there never was any real question as to whether or not the notes would be renewed and that completion of the Financial Statement in each instance was just a mere "formality" done purely for record keeping purposes in order to appease the bank examiners. Although the debtor attempted to be as accurate as possible when completing the Financial Statements, the figures presented were in a number of instances merely estimated. Dammen testified that with respect a number of the figures, he was never required to submit an exact amount. The loan review officer was apparently quite

1. Oddly, neither the promissory notes themselves nor any documentation which evidenced the "original" loan transactions in the instant case were offered into evidence.

2. The renewals in this case were ostensibly granted as a normal incident to the Bank's relationship with Dammen. There was no evidence presented which intimated that Dammen was

ever in default on any of the obligations prior to any renewal.

3. Absolutely no evidence whatsoever was presented in this case which even intimated that the Bank required or obtained any financial information in connection with the initial extension of credit with respect to the first note on March 4, 1988.

familiar with Dammen and was well aware that some of the figures were indeed estimated.

Sometime in late 1990 or early 1991, Dammen attempted to purchase a home as a first time home buyer and contacted the same loan review officer at the Bank in order to obtain F.H.A. financing for the purchase. In contrast to the Financial Statement completed in connection with the renewals of the promissory notes, the application process for the home mandated detailed and exact information. Consequently, Dammen spent at least one-half an hour on three separate occasions with the loan review officer and was required in each instance to return to his residence and obtain specific financial information from his personal records.

Dammen's relatively long financial history with the Bank over the years had been quite satisfactory and Dammen, prior to the bankruptcy, was generally considered by the Bank to be a good customer. He had a number of smaller obligations with the Bank which had previously been paid in full and in accordance with agreed upon terms. The Bank ostensibly became concerned for the first time, however, when Dammen last renewed the notes in March of 1991 since he did not remit as substantial a payment toward the reduction of the outstanding obligations as he previously had.[4] The loan review officer indicated that although a greater reduction of the outstanding obligations was expected, the Bank always went the "extra mile" for good customers such as Dammen who had a good track record.

Dammen and his father had a falling out in May or June of 1991 which led to Dammen's withdrawal from the family farming operation. For reasons which were not altogether apparent from the instant proceeding, Dammen filed for relief under Chapter 7 of the United States Bankruptcy Code on April 21, 1993. At the time of the bankruptcy filing, Dammen owed the Bank $19,132.28 in principal and interest. The Bank commenced the instant action under 11 U.S.C. § 523(a)(2)(B) seeking a determination that the aforementioned indebtedness was nondischargeable due to allegedly materially false information contained in the March 1, 1991 Financial Statement submitted in connection with the renewal upon which it relied to its detriment.

## CONCLUSIONS OF LAW

1.

Section 523 of the United States Bankruptcy Code enumerates specific exceptions to the general rule of the dischargeability of debts in bankruptcy. It is axiomatic bankruptcy law to observe that in determining whether a particular debt falls within the ambit of an exception to discharge under 11 U.S.C. § 523, it was the intention of Congress that the statute should be construed liberally in favor of the debtor and strictly against the objecting creditor in order to effectuate the fresh start principles which pervade the entire bankruptcy system. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987); 3 *Collier on Bankruptcy* ¶ 523.05A, at 523–19 (15th ed. 1993). In accordance with the foregoing, any evidence presented in this § 523 action must be viewed in light of the congressional intent.

The operative provision relied upon by the plaintiff, Ramsey National Bank & Trust Co., to establish a basis for the nondischargeability of the debt owed by the defendant is § 523(a)(2)(B), which renders nondischargeable in a Chapter 7 case any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> \*   \*   \*   \*   \*   \*
>
> (B) use of a statement in writing—
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, proper-

---

4. In connection with the last renewal, Dammen remitted $1,000.00 toward the reduction of the outstanding indebtedness.

ty, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; ...

11 U.S.C. § 523(a)(2)(B). The elements which must be proven to establish the non-dischargeability of a particular debt are set forth succinctly in the aforementioned statutory provision. Thus, under the foregoing section, a creditor may have a debt owed to it declared nondischargeable provided that the following six elements are established:

(1) the debtor makes, (2) a statement in writing, (3) respecting the debtor's or an insiders [sic] financial condition, (4) which statement is materially false, (5) which is made with the intent to deceive, and (6) which is reasonably relied upon by the creditor.

*Avco Fin. Servs., Inc. v. Frey (In re Frey),* 150 B.R. 742, 745 (Bankr.D.N.D.1992).

■ The burden of proving each and every element of § 523(a)(2) is entirely upon the party seeking to have a given debt declared nondischargeable. *Management Jets Int'l, Inc. v. Mutschler (In re Mutschler),* 45 B.R. 482, 490 (Bankr.D.N.D.1984). *See* F.R.Bankr.P. 4005. If an objecting plaintiff fails to prove every element contained within the statutory provision, the indebtedness in question is entirely dischargeable. *Valley Nat'l Bank v. Bush (In re Bush),* 696 F.2d 640, 643 n. 4 (8th Cir.1983).

■ The proper standard of proof applicable in nondischargeability actions which arise under § 523(a) was conclusively established by the United States Supreme Court as the ordinary preponderance of the evidence standard. *Grogan v. Garner,* 498 U.S. 279, 283–91, 111 S.Ct. 654, 657–61, 112 L.Ed.2d 755 (1991). Recent decisions of this court clearly apply the Supreme Court standard to actions under § 523(a)(2)(B). *See, e.g., Vangelisti v. Kerbaugh (In re Kerbaugh),* 159 B.R. 862, 870 (Bankr.D.N.D.1993). As such, the defendant in this case is seriously misguided when he relies upon a 1989 Illinois bankruptcy court decision for the proposition that the applicable standard of proof under § 523(a)(2)(B) is clear and convincing evidence. (*See* Defendant's Post–Trial Memorandum, at 2).

With the standard articulated by the Supreme Court in *Grogan* and most recently applied by this court in *Kerbaugh* in mind, the court will measure the facts of this case as previously outlined against the legal elements that the plaintiff must establish to support a finding of nondischargeability under § 523(a)(2)(B) of the Bankruptcy Code.

2.

*In Writing Respecting the Debtor's Financial Condition*

■ There is no question that the threshold requirement of a "renewal ... or refinancing of credit" has been proven in this case. Likewise, the plaintiff has shown the basic § 523(a)(2)(B) element of use of a written statement respecting the debtor's financial condition since the information on the Bank's Financial Statements executed by Dammen in conjunction with the renewals called for a delineation of the debtor's assets, liabilities, and net worth and provided a realistic assessment of Dammen's creditworthiness and financial capacity.

3.

*Materially False*

■ Once it is shown that the statement was in writing respecting the debtor's financial condition, the next requirement under § 523(a)(2)(B) is that the statement at the time it was made was not only false, but "materially false." A statement utilized by a debtor in order to obtain an extension or renewal of credit is "materially false" within the meaning of the statutory exception to the discharge of debts if it not only contains erroneous information, but rather contains information that is substantially inaccurate. *Miller v. Boles (In re Boles),* 150 B.R. 733, 740 (Bankr.W.D.Mo.1993). Stated differently, "[i]t is not sufficient to show that the statement is [merely] factually incorrect ...", the falsity must be an "important or substantial untruth." *Management Jets Int'l, Inc. v. Mutschler (In re Mutschler),* 45 B.R. 482, 490, 491 (Bankr.D.N.D.1984).

■ The concept of "materiality" within the context of § 523(a)(2)(B) includes both

objective and subjective components. Honorable Nancy C. Dreher & Matthew E. Roy, *Bankruptcy Fraud and Nondischargeability Under Section 523 of the Bankruptcy Code,* 69 N.D.L.Rev. 57, 76 (1993). Objectively, a statement is materially false for purposes of § 523(a)(2)(B) if it is one that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Avco Fin. Servs. v. Frey (In re Frey),* 150 B.R. 742, 745 (Bankr. D.N.D.1992). The relevant subjective inquiry, although not dispositive, is whether the complaining creditor would have extended credit or renewed an obligation had it been apprised of the debtor's true situation. This court has previously noted that:

'An incorrect or erroneous financial statement is not necessarily materially false.... The question of materiality should be judged not on the basis of the size or seriousness or [sic] the error, but by a comparison of the debtor's actual financial condition with the picture he paints of it.'

*Mutschler,* 45 B.R. at 491 (quoting *In re Denenberg,* 37 B.R. 267 (Bankr.D.Mass. 1983)) (citations omitted). Further, it is well established that the concealment, understatement, or omission of material information can readily constitute a statement which is materially false equally as well as a false assertion. *See Frey,* 150 B.R. at 745; *Mutschler,* 45 B.R. at 490–91.

In this case, the debtor readily concedes that the Financial Statements submitted contained certain inaccuracies and that a number of the figures were merely estimated. However, the court is of the opinion that any complained of inaccuracies were either known by the Bank or readily apparent from the face of the documents themselves. Although the evidence on this point is somewhat disputed and not altogether crystalline, it is clear that the Bank had a comprehensive picture of the debtor's financial condition. The very same loan review officer that had been working with Dammen throughout the years not only specifically advised him what and to what extent to disclose certain financial data, but actually assisted him with the preparation of the Financial Statements. The unchallenged testimony of the debtor reveals that the debtor was completely candid about the nature and the extent of his financial interest in various assets which the Bank now challenges. There is no question in the court's mind that the Bank was fully aware that the majority of the disclosed financial data were merely estimated. Moreover, the Bank assisted the debtor in completing a detailed and specific financial application in conjunction with a home purchase shortly prior to the final renewal.

This court cannot conclude that the Financial Statement as whole is "materially false" especially when the bank itself prepared a lot of the information disclosed and undertook to advise the debtor on the extent of disclosure.

### 4.
### *Intent to Deceive*

Under § 523(a)(2)(B), a creditor must demonstrate by a fair preponderance of the evidence that the financial statement was made or submitted with an intention of deceiving the creditor. *Vangelisti v. Kerbaugh (In re Kerbaugh),* 159 B.R. 862, 872 (Bankr. D.N.D.1993). The requirement of an intent to deceive may in appropriate cases be inferred from the totality of evidence. Although actual knowledge of the falsity of financial information provided by a debtor to a creditor will satisfy the intent requirement, a demonstration that the debtor acted with recklessness as to the truth or accuracy of the submitted information will suffice. *Frey,* 150 B.R. at 745. It has thus been held that where a debtor either knowingly or recklessly makes a false representation which the debtor knows or at least should have known at the time the statement was made will induce a lender to extend credit in the first instance or subsequently renew an outstanding obligation which has since become due, scienter or an intent to deceive sufficient to satisfy § 523(a)(2)(B) may be logically inferred. *Household Fin. Corp. v. Howard (In re Howard),* 73 B.R. 694, 703 (Bankr. N.D.Ind.1987).

There has been absolutely no evidence presented in this case which establishes to the court's satisfaction that Dammen,

an individual unsophisticated in the area of finance and who was relying upon the direction of the Bank's loan review officer, either knowingly or recklessly submitted false financial information. Accordingly, the plaintiff wholly fails to meet its burden with the requisite degree of proof as to the element of intent to deceive.

### 5.
#### Reasonable Reliance

For a debt to be excepted from discharge under § 523(a)(2)(B), the creditor's reliance on the materially false written statement must satisfy a two-part inquiry by demonstrating that its reliance was both *actual* and *reasonable*.

Actual reliance mandates that the creditor did in fact subjectively rely upon or utilize the submitted information when making the decision to extend or renew credit. To establish actual reliance, a showing of a degree of proximate cause must be made. This court has found that:

Proximate cause is not, in the tort sense, an independent element of proof but is merely a way of clarifying the causation factor inherent from a complete reading of § 523(a)(2)(B). The preface to this section provides that a discharge does not discharge a debtor from a debt for obtaining an extension of credit *by* use of a false statement. Thus, the statute presupposes in the first instance that it was the statement which was the causative factor in the extension [or renewal] of credit, without which the other elements of this section are not even reached.

*Management Jets Int'l, Inc. v. Mutschler (In re Mutschler)*, 45 B.R. 482, 492 (Bankr. D.N.D.1984). As such a creditor must adequately demonstrate that its reliance on the false statement was a contributory cause of the extension or renewal of credit and ' "that credit would not have been granted if the lender had received accurate information." ' *Marx v. Reeds (In re Reeds)*, 145 B.R. 703, 707 (Bankr.N.D.Okla.1992) (quoting *In re Anzman*, 73 B.R. 156, 164 (Bankr.D.Colo. 1986)). *See Mutschler*, 45 B.R. at 492. It is well established, however, that although actual reliance *must* be demonstrated, the credi-

tor does not have to show that the writing was the *only* influential factor in the decision to extend or renew credit. *Mutschler*, 45 B.R. at 492. It is sufficient for § 523(a)(2)(B) if the creditor establishes that it *partially* relied on the false statement or that the false statement was the principal precipitant for the extension of credit, in the absence of which credit would not have been made. *Id.*

The "reasonableness" of a creditor's reliance on a false statement is an objective determination, i.e. that degree of care which a reasonably prudent creditor in an average business transaction under similar circumstances would exercise. *Marx v. Reeds (In re Reeds)*, 145 B.R. 703, 707 (Bankr. N.D.Okla.1992); *Mutschler*, 45 B.R. at 492–93. In articulating the requisite objective inquiry, this court has stated:

'[T]he reasonableness of a creditor's reliance on a [false] statement should be judged by comparing the creditor's actual conduct with (1) the creditor's own normal business practices, and (2) the standards and customs of the industry, (3) in light of the surrounding circumstances existing at the time the application was made and credit was extended [or renewed].'

*Mutschler*, 45 B.R. at 493 (quoting *In re Patch*, 24 B.R. 563 (Bankr.D.Md.1982)).

Although a creditor is generally not under a *per se* duty of verification or under an absolute duty to make independent inquiries into the financial condition of a debtor or to confirm the accuracy of a written financial statement, a creditor's reliance on a false statement has readily been found to be unreasonable where the false writing was obviously false on its face, when the creditor knows or has reason to know that the writing is incomplete or inaccurate, or when the creditor's own investigation suggests that the writing was incomplete or inaccurate. *Mutschler*, 45 B.R. at 493 (citing various authorities).

This court easily concludes that the Financial Statement in the instant case was of *no consequence* in the Bank's decision to renew the loans. The Bank simply failed to prove that it required the Financial State-

ment as a condition precedent to the approval of the renewals or that there was any causal connection between the submission of the Financial Statement and the final renewal. There is no indication in the record nor has there been any insistence on the part of the Bank that its prospects for having the unsecured obligations in the instant case paid would have been enhanced if it had not been renewed. The entire indebtedness owed to the Bank already existed at the time the alleged misrepresentation took place. Consequently, the Bank had no choice but to renew and mitigate its loss the best way possible by obtaining payment toward the reduction of the indebtedness in exchange for the renewals. The Bank's arguable forfeiture of remedies and general forbearance from immediate collection had no impact since such efforts would more than likely have been fruitless if undertaken in this case. Undoubtedly, had the obligations not been renewed, the debtor simply would have filed his bankruptcy petition earlier.

The Bank was intimately familiar with the debtor as well as his financial affairs and the Bank had always considered him to be a good customer. The Bank was well aware that the debtor's father was on the Bank's board of directors. Moreover, the initial unsecured loans were ostensibly made without the benefit of a financial statement or any documented financial data whatsoever. In the face of facially inconsistent financial data, the Bank did not attempt to perform even the most cursory verification or seek an explanation from the debtor but immediately approved the renewals upon execution. The inescapable conclusion in this case is that Financial Statements were not taken with any serious purpose of relying upon them to any significant degree, but merely ceremonial devices routinely obtained perfunctorily as a part and parcel of the original loan transactions.

The court is satisfied that the plaintiff neither actually nor reasonably relied upon the financial statement to its detriment.

**5.** It is not the *original* loan transactions nor the subsequent Financial Statements executed on February 24, 1989 and March 5, 1990 in connection with the yearly renewals in which the plain-

**6.**

For the aforementioned reasons, the court easily concludes that the plaintiff, Ramsey National Bank & Trust, Co., has failed to prove by a fair preponderance of the evidence all the requisite elements necessary to support the denial of discharge under § 523(a)(2)(B).

**7.**

The plaintiff in this action does not aver nor even intimate that the events surrounding the *creation* of the indebtedness, as evidenced by the executed promissory notes of March 4, 1988, and May 11, 1989, give rise to a § 523(a)(2) action. There was no evidence which suggested that any financial information was submitted or false representation made in order to procure the advancement of funds in the first instance. To the contrary, it is the Financial Statement submitted in conjunction with the final *renewal* of the notes on March 1, 1991 which the plaintiff cites as the focal impetus for its cause of action under § 523(a)(2)(B).[5] As such, the debt owed to the Bank already existed at the time the alleged misrepresentation took place. The plaintiff nevertheless seeks to have the *entire* indebtedness declared nondischargeable despite the fact that it avers that only the final renewal was fraudulently procured.

Clearly, the plaintiff in this case advanced no additional funds or "new money" in connection with the renewals but merely extended the maturity dates in exchange for partial payments on the underlying indebtedness. The plaintiff presented no evidence that it forfeited any remedies or otherwise relied to its detriment on an allegedly false Financial Statement with respect to the existing notes. In a number of instances where a plaintiff advancing a cause of action under § 523(a)(2) has failed to establish that it advanced "new money" or otherwise demonstrated that it has forfeited collection remedies with respect to *existing* credit in direct reliance on the fraudulent representation, courts have ruled as a matter of law that a decree of nondis-

tiff in this case bases its cause of action but, rather, the March 1, 1991 Financial Statement submitted in conjunction with the final renewal.

chargeability does not lie as an appropriate remedy since it would essentially provide a creditor with a punitive measure of relief. *See Siriani v. Northwestern Nat'l Ins. Co. (In re Siriani)*, 967 F.2d 302, 305 (9th Cir. 1992) (agreeing that a creditor seeking a determination of nondischargeability under § 523(a)(2)(B) must demonstrate that it had valuable collection remedies at the time that it agreed to renew the obligation, and that those remedies later became worthless); *Jennen v. Hunter (In re Hunter)*, 771 F.2d 1126, 1130 (8th Cir.1985) (opining that it does not seem equitable in a § 523(a)(2)(A) action for a debtor to be deprived of a discharge on all of an indebtedness to a specific creditor merely because a small portion of it was procured dishonestly); *Household Fin. Corp. v. Danns*, 558 F.2d 114, 116 (2d Cir.1977); *In re Peterson*, 437 F.Supp. 1068, 1070–71 (D.Minn.1977) (finding that the decree of nondischargeability could only apply to the new or fresh money advanced in reliance on the false financial statement in a case decided under the former Bankruptcy Act); *Sur Gro Plant Food Co. v. Curl (In re Curl)*, 64 B.R. 14, 17–18 (Bankr.W.D.Mo.1986); *In re Gadberry*, 37 B.R. 752 (Bankr.C.D.Ill.1984); *United Missouri Bank of Carthage v. Etcheson (In re Etcheson)*, 47 B.R. 8 (Bankr. W.D.Mo.1984); *Norwest Card Servs. v. Barnacle (In re Barnacle)*, 44 B.R. 50 (Bankr. D.Minn.1984); *Barneveld State Bank v. Chambers (In re Chambers)*, 23 B.R. 206, 209–210 (Bankr.W.D.Wis.1982) (noting that a creditor is entitled to only bar a discharge of that portion of its claim that was fraudulently obtained). Authority addressing this issue, however, is not altogether consistent nor readily reconcilable. Moreover, some courts have found that relief under § 523(a)(2) is not limited to "fresh cash" or compensatory damage and, accordingly, have held that an entire debt may be found to be nondischargeable when credit is renewed despite the absence of an advancement of "new money" at the time of the renewal. *See Shawmut Bank, N.A. v. Goodrich (In re Goodrich)*, 999 F.2d 22, 25–27 (1st Cir.1993); *John Deer Co. v. Gerlach (In re Gerlach)*, 897 F.2d 1048, 1050–52 (10th Cir.1990); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1289 (8th Cir.1987) (finding that the entire renewed indebtedness was nondischargeable since this was the damage proximately caused by the debtor's deceit); *Codisco, Inc. v. Marx (In re Marx)*, 138 B.R. 633, 636–37 (Bankr.M.D.Fla.1992); *First Fed. Savs. & Loan Ass'n v. Mancini (In re Mancini)*, 77 B.R. 913, 914–16 (Bankr.M.D.Fla.1987); *Lincoln First Bank, N.A. v. Tomei (In re Tomei)*, 24 B.R. 204, 206 (Bankr.W.D.N.Y. 1982); *First American Nat'l Bank v. Carter (In re Carter)*, 11 B.R. 992, 993–98 (Bankr. M.D.Tenn.1981); *Seaboard Fin. Co. v. Blair*, 148 N.W.2d 756, 759 (Mich.1967).

The parties to this action have not presented evidence or argument specifically directed toward the resolution of the issue as highlighted above. In light of plaintiff's failure to meet its burden of proof under § 523(a)(2)(B), this court finds it unnecessary to resolve this issue in this case and has assumed, *arguendo*, that the *entire* indebtedness in this matter was subject to a nondischargeability determination under § 523(a)(2)(B).

8.

■ The defendant-debtor in this case requests the recovery of costs and attorney's fees associated with bringing the instant adversary proceeding under § 523(d) of the Bankruptcy Code. Under § 523(d), a prevailing debtor is entitled to costs and attorney's fees associated with an adversary proceeding instituted by a creditor under § 523(a)(2) if the debt is a "consumer debt" *and* "if the court finds that the position of the creditor was not substantially justified...." 11 U.S.C. § 523(d). "Consumer debt" is defined under the Code as "debt incurred by an individual primarily for a personal, family, or household purpose". 11 U.S.C. § 101(8). There was no evidence in this case which establishes that the debt was a "consumer debt". To the contrary, there was a strong indication that money advanced in this case was being utilized primarily in connection with the debtor's farming operation. Notwithstanding the patent defect in the definitional prerequisite to the establishment of a § 523(d) recovery, the court finds that the plaintiff-creditor was "substantially justified" in bringing the instant action.

## CONCLUSION

Ramsey National Bank & Trust, Co. has failed to meet its burden of proof for nondischargeability under § 523(a)(2)(B). Accordingly, **IT IS ORDERED, ADJUDGED AND DECREED** that judgment be entered in favor of the defendant, Keith A. Dammen, and against the plaintiff Ramsey National Bank & Trust, Co. in the sum of $19,132.28, said sum representing the unpaid amount of the plaintiff's claim being dischargeable in bankruptcy.

Keith A. Dammen's request for costs and attorney's fees under § 523(d) of the Bankruptcy Code is in all things **DENIED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**