In re Mark ERDMAN and Loraine Erdman dba Southwest Building Design and dba La Limo, Debtors.

Richard A. Simek and Paule J. Simek, Plaintiffs,

v.

Mark Erdman and Loraine Erdman, Defendants.

Bankruptcy No. 98–31502.
Adversary No. 98–7083.

United States Bankruptcy Court, D. North Dakota.

May 25, 1999.

Gary Ramsey, Dickinson, ND, for plaintiff.

Robert Keogh, Dickinson, ND, for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This Adversary Proceeding arises by Complaint filed on December 4, 1998, by Plaintiffs Richard A. and Paule J. Simek ("Simeks"), against Defendants Mark and Loraine Erdman ("Erdmans"), alleging that the Erdmans obtained a loan from them in the principal amount of $25,027.05 by means of false pretense, false representation, or actual fraud, such that the debt should be declared nondischargeable in the Erdmans' Chapter 7 bankruptcy case pursuant to 11 U.S.C. § 523(a)(2)(A). Trial was conducted in this matter before the undersigned on April 27, 1999. From the evidence there presented and the parties' joint Stipulation of Undisputed Facts ("Stipulation"), the Court finds the following facts to be material to the issues raised, and makes the following conclusions of law:

## I. FINDINGS OF FACT

Mr. and Mrs. Erdman are residents of Dickinson, North Dakota, and have been married since 1978. Mr. Erdman is an architectural consultant currently employed in New York State. At all times relevant to this matter, Mr. Erdman was, additionally, the president of Southwest Building Design, Inc. ("SBD"), a North Dakota corporation since 1991, which provided limousine services in Dickinson, North Dakota—its principal place of business-and in the surrounding region. In addition to his role as president, Mr. Erdman testified at trial that he was the only member of SBD's board of directors, that is, in effect that, "[he] *was* the board of directors."

According to SBD's Articles of Incorporation, the company was authorized to issue 50,000 shares of stock, for which it listed "no par value." While Mr. Erdman acceded in the Stipulation to being SBD's sole shareholder, at trial, he testified that *he* never issued stock in SBD; that, indeed, no stock *was* ever issued in the company; and that he did not purchase any stock in the company. He further testified that no dividends were ever paid by the company on any stock.

As SBD's president, Mr. Erdman refused a salary. At trial, he testified that he operated the company with "very little capital," and that *his only function as president* was to provide needed funding to the company, both his own and that obtained through lending institutions, for only the latter of which he signed promissory notes. He further testified that although he had "final" decision-making authority in the company, he did not exercise it. He stated that he only incorporated SBD to shield himself from any personal liability which might otherwise arise in the course of conducting SBD's business.

Mrs. Erdman, too, assumed several titles at SBD, serving as its vice president,

secretary-treasurer, and initial registered agent. She worked as the company's office manager, as a driver, and later as its bookkeeper and accountant.

Mr. Erdman's brother, Willard Erdman, Jr., served, at some point, as a vice president of SBD for a year. However, he had little or nothing to do with the operation of the company.

SBD counted several employees in addition to Mrs. Erdman, including Donna Marie Torstenson ("Ms. Torstenson"). Ms. Torstenson initially served as a driver and receptionist at SBD, and then, in addition to such duties, gradually assumed those of office manager from Mrs. Erdman.

From 1991 until May 1996, SBD provided limousine services under its own name, as well as others, including: "SBD Limousine," "SBD Shuttle," "Dickinson Limousine," "Taxi 6200," and "La Limo."[1] No separate bank accounts, books or records were maintained, and no separate employees were hired, for the conduct of SBD's business under these other names.

SBD maintained a checking account in its name with Community First Bank of Dickinson. During its years of operation, SBD filed corporate tax returns prepared by Mrs. Erdman and signed by Mr. Erdman, all of which showed it to be operating at a net annual loss. In this connection, SBD had great difficulty in meeting its outstanding obligations, and did, while Ms. Torstenson was employed with it, regularly fail to meet many such obligations in a timely fashion.

In late 1994, the Erdmans decided to seek a corporate loan in the amount of $250,000.00. In this connection, they began communicating with an individual named Deb Mace ("Mace"), the daughter of one of their employees, in December 1994 or January 1995. According to Mr. Erdman's testimony, Mace assured them

that she could secure a loan of $500,000.00 for SBD.

Separately, and at the same time, Ms. Torstenson-aware of the Erdmans' desire to obtain a loan[2]—approached Mrs. Simek to ask that she and her husband loan the Erdmans money. Ms. Torstenson was a long-time friend of Mrs. Simek's, and Mrs. Simek knew that Ms. Torstenson worked for the Erdmans. In making her request to her friend, Ms. Torstenson represented "that the company could do good."

Thereafter, between January and February 1995, Mrs. Erdman met with Mrs. Simek on several occasions, and discussed the possibility of obtaining a loan. At a meeting in SBD's offices, Mrs. Erdman told Mrs. Simek that she and her husband were in need of a $25,000.00 loan. Thereafter, Mrs. Simek spoke with her husband about the proposition. Mr. Simek had heard of SBD and, motivated by an interest in assisting a local business, agreed to meet with the Erdmans.

The meeting took place in the early part of February 1995 at a local grocery store, with both couples in attendance. There, the Erdmans made several representations to the Simeks. First, after presenting the Simeks with a promotional binder containing photographs of SBD's vehicles, press clippings, advertisements, rate information, and a computer printout showing robust increases in SBD's business from 1992 to 1994, the Erdmans stated that SBD's business had more than doubled that year, that statistic being represented in "number of [limousine] runs." In this connection, the Erdmans did not divulge any information concerning SBD's indebtedness, nor did they reveal SBD's unprofitability.

Second, the Erdmans told the Simeks that they had located an antique limousine in New York State which could help SBD

---

1. Mr. Erdman testified that La Limo became a separate entity after SBD filed its bankruptcy petition.

2. According to Ms. Torstenson's testimony, Mrs. Erdman asked her, in January 1995, if she knew of anyone who could loan them money.

develop a new niche market and thereby improve its business. They stated that Mr. Erdman was in immediate need of the funds necessary to purchase the vehicle—some $25,000.00—as it would otherwise be sold to another party. In this connection, the Erdmans told the Simeks that their loan proceeds would be used to purchase the vehicle. The Erdmans also stated or implied that any remaining loan proceeds would be used to reduce SBD's debt. From this conversation, the Simeks were led to believe that the antique limousine would be purchased in full with their loan proceeds, and the Erdmans did not disabuse them of this notion.

Third, the Erdmans also disclosed to the Simeks the particulars of the Mace loan, which, they indicated, would shortly be completed. In this connection, the Erdmans stated that a short-term loan from the Simeks would serve as "a stepping stone" towards the Mace loan, in essence, as something to tide them over until they received their loan proceeds from Mace.

After their meeting with the Erdmans, the Simeks agreed to make a loan of slightly more than $25,000.00. The agreement was contingent, however, upon the Simeks first obtaining a loan themselves, which would then serve as the source of the Erdmans' loan proceeds. Ultimately, the Simeks received a loan, and thus, were able to turn around and make their own loan to the SBD.

On February 10, 1995, the Simeks loaned SBD the sum of $25,027.05 in a transaction evidenced by a promissory note executed by Mr. Erdman, as the SBD's president, on February 20, 1995. In this connection, the Erdmans offered real property which they owned in Gladstone, North Dakota, as security for the note. As executed, the note purports to be secured by the following described real property: the East one-half of Lot 20, all of Lot 21, and the West one-half of Lot 22 of Block 11 of Gladstone, North Dakota. In this connection, Mr. Erdman promised Mr. Simek that he would execute a mort-gage in the Simeks' favor on the property and that he would, himself, take care of the necessary "paperwork."

Mr. Simek trusted that Mr. Erdman would do so. In agreeing to make the loan, he relied on Mr. Erdman's promise, and indeed, the loan was conditioned upon it. Only some years later, when Mr. Simek learned that the property had been sold, did he also learn that Mr. Erdman had failed to execute the mortgage in favor of the Simeks, and that the property did not secure the promissory note.

Mr. Simek also trusted that the Erdmans would apply the loan proceeds to purchase the antique limousine in full. Yet, the Erdmans did not do so. Instead, they purchased the antique limousine under an Agreement and Bill of Sale executed on February 8, 1995, by making payment of $12,500.00 upon delivery of the vehicle, with the remaining $12,500.00 to be paid pursuant to a promissory note also dated February 8, 1995.

Further, the Simeks intended that their loan to the Erdmans be a corporate, rather than personal, obligation, an intention of which the Erdmans were very much aware. Indeed, the Simeks would not have made a personal loan to the Erdmans, and the Erdmans knew this. Nevertheless, Mr. Erdman deposited the Simek loan proceeds into his own personal bank account, rather than SBD's corporate account. Then, from his own account, he made the $12,500.00 downpayment towards the purchase of the antique limousine by the issuance of two checks aggregating that amount.

Lastly, the Simeks understood that the antique limousine would be the property of SBD, that is, corporate property, and not that of either Mr. or Mrs. Erdman personally. Yet, Mr. Erdman titled the antique limousine in his name rather than the corporations's, and, at trial, both Erdmans testified that they considered the limousine to be his personal property. Moreover, they treated it as such, and this despite

the fact that at some point after March 10, 1995, Mr. Erdman, or the Erdmans collectively, caused SBD to "reimburse" Mr. Erdman the sum of $12,500.00 which he paid as a downpayment towards the purchase of the antique limousine.

Ultimately, the Mace loan was never realized and, on May 2, 1996, SBD filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. At the time that SBD filed its bankruptcy petition, $27,-677.68 remained outstanding on the loan, that figure being comprised of $24,884.18 in principal and $2,793.50 in interest, with per diem interest accruing at the rate of $14.3159 thereafter. The only assets listed in SBD's Schedules are: a 1985 three-quarter ton Ford truck in which the debtors claim an interest valued at $4,500.00; a 1988 Cadillac in which they claim an $8,000.00 interest; a cellular phone in which they claim an interest of $50.00; a $700.00 interest being held in the Stark County Sheriff's Office; and a $12,000.00 interest in a potential claim against, inter alia, Mace and Ms. Torstenson.[3] The Erdmans filed their joint and voluntary Chapter 7 bankruptcy petition on September 3, 1998.

## II. CONCLUSIONS OF LAW

By their Complaint, the Simeks allege, inter alia, that the Erdmans obtained the loan from them by false pretenses, false representations, or actual fraud; that Mr. Erdman misapplied the loan proceeds by using $12,500.00 to purchase the antique limousine in his own name, and by putting the balance to his own personal use or that of his wife; that the Erdmans are personally obligated for the loan's repayment; and that, pursuant to 11 U.S.C. § 523(a)(2)(A), the Erdmans are not entitled to a discharge of the indebtedness represented by the loan. As relief, the

Simeks request that the loan be deemed the Erdmans' personal obligation; that the indebtedness represented by the loan be deemed nondischargeable; and that the Simeks be awarded judgment for the same, together with the accrued interest thereon, as well as costs and disbursements.

In response, the Erdmans generally deny the Simeks' allegations. The Erdmans also suggest, without citation to any case authority, that it would be inappropriate for the Court to enter a money judgment against them in this matter should the Court find that the Simeks' allegations are well-supported. The Court will first take up their latter argument.

### 1. Monetary Judgment

The Erdmans raise the issue of whether implicit in the Bankruptcy Court's jurisdiction to entertain a § 523 action is the Court's authority to enter a monetary judgment for any sum found to be nondischargeable. Pursuant to 28 U.S.C. § 157(b)(1), bankruptcy courts are granted the express authority to *hear* and *determine* all core proceedings and to enter appropriate orders and judgments. Specifically included within the ambit of such core proceedings is the right to determine the dischargeability of particular debts. *See* 28 U.S.C. § 157(b)(2)(I). Section 523(a) of the Bankruptcy Code enumerates the various categories of debts which, if proved, become nondischargeable.

There is no question that bankruptcy courts have jurisdiction to make determinations with regard to the dischargeability of various debts. A "debt," for purposes of the Bankruptcy Code, is simply defined as a liability on a claim, 11 U.S.C. § 101(12), and a "claim" is, in turn, defined as any right to payment whether or not such right is reduced to judgment, liqui-

---

**3.** In *Wagner v. Erdman* (*In re Southwest Bus. Design, Inc.*), Adversary Number 96–7092 (Bankr.D.N.D. July 17, 1997), the Court found that additional assets which the Erdmans had claimed as their personal property in their bankruptcy schedules were, in fact, the property of SBD, including: three limousines— one of which is at implicated in the present matter, that is, the antique limousine—and two computers.

dated or unliquidated, 11 U.S.C. § 101(5)(A). The framers of the Bankruptcy Code were obviously aware that many debts sought to be rendered nondischargeable pursuant to § 523 would be in the nature of unliquidated claims, and indeed, most such actions are premised upon an unliquidated right to payment. Rendering a determination as to the nondischargeability of a particular debt in a specific sum is tantamount to liquidating the claim, and 28 U.S.C. § 157(2)(B) and (O) strongly suggest that bankruptcy courts have authority to liquidate all claims except personal injury and wrongful death claims. This Court concludes that in § 523 actions where a specific sum has been determined to be nondischargeable, the claim thereby becomes liquidated to that extent, and a monetary judgment should be entered.

### 2. Exception to Discharge

■ Exception to the general rule that debts are discharged in bankruptcy is found in 11 U.S.C. § 523. In determining whether a debt falls within the ambit of a particular exception to discharge under § 523, the Court liberally construes the statute in favor of the debtor and strictly against the objecting creditor in order to effectuate the fresh start principles permeating the Code and its enactment. *See Ramsey Nat'l Bank & Trust Co. v. Dammen (In re Dammen )*, 167 B.R. 545, 549 (Bankr.D.N.D.1994); *First Int'l Bank v. Kerbaugh (In re Kerbaugh )*, 162 B.R. 255, 260 (Bankr.D.N.D.1993). "This liberal construction is, however, tempered by the view that such equitable considerations 'are applicable only to honest debtors.' " *In re Kerbaugh, supra* (quoting *Caspers v. Van Horne (In re Van Horne )*, 823 F.2d 1285, 1287 (8th Cir.1987), in turn quoting *In re Hunter,* 771 F.2d 1126, 1130 (8th Cir.1985)) (second internal quotation marks omitted).

■ The operative provision upon which the Simeks rely to establish a basis for nondischargeability is § 523(a)(2)(A), which, in a Chapter 7 case, excepts from discharge any debt of an individual debtor:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). Thus, under the foregoing statutory provision, nondischargeability is established upon proof of the following five elements:

1. That the debtor made representations;

2. That he knew the representations were false at the time he made them;

3. That he made them with the intention and purpose of deceiving the creditor;

4. That the creditor justifiably relied upon the representations; and

5. That the creditor sustained the alleged loss and damage as the proximate result of the representations.

*See id.; Field v. Mans,* 516 U.S. 59, 75, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995); *In re Slominski,* 229 B.R. 432, 435 (Bankr. D.N.D.1998); *Security Bank v. Wehri (In re Wehri )*, 212 B.R. 963, 967 (Bankr. D.N.D.1997). Under the fourth element, although the standard is one of justifiable reliance, as opposed to *reasonable* reliance, reasonableness of reliance is *not irrelevant,* "for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact." *Field, supra.* Nevertheless, under the applicable standard, "[n]aifs may recover ... in bankruptcy[.]" *Id.*

■ The burden of proving each element under a § 523(a)(2)(A) action rests entirely upon the party bringing it. *See* Fed.R.Bankr.P. 4005 [4]; *In re Slominski,*

---

4. Rule 4005 of the Federal Rules of Bankruptcy Procedure provides as follows: "At the

229 B.R. at 435; *In re Dammen,* 167 B.R. at 550. That burden is, merely, by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 283–91, 111 S.Ct. 654, 657–61, 112 L.Ed.2d 755 (1991); *In re Wehri,* 212 B.R. at 967; *In re Kerbaugh,* 159 B.R. at 870. Where an objecting plaintiff fails to establish every element of the § 523(a)(2)(A) action under this standard, the indebtedness at issue is dischargeable. *See In re Dammen, supra.*

■ Under the instant facts, the Court concludes that the Simeks have proven by a preponderance of the evidence that the Erdmans did make false representations to them such that the Erdmans' loan indebtedness, and all other additional indebtedness stemming from it, will be declared nondischargeable. In this respect, the Court finds that the Erdmans either made the false statements to the Simeks, knowing them to be false, and with the intention and purpose of deceiving the Simeks in order to obtain a loan from them, or actively omitted information which, if known, would have given the Simeks pause, and with the intention to mislead the Simeks through misunderstanding or omission, for the same purpose, as follows:

1. That their business, SBD, was robust and performing well, when in fact it was entirely and consistently unprofitable;

2. That they would purchase the antique limousine in full with the loan proceeds, when in fact they had no intention of doing so, but rather, only applied a little less than half of the loan proceeds to the actual purchase;

3. That the loan would be treated as a corporate loan to SBD, when in fact Mr. Erdman treated it as a personal loan to himself;

4. That the antique limousine would be corporate property, when in actuality, the Erdmans treated it as either

their or Mr. Erdman's personal property; and

5. That Mr. Erdman would execute a mortgage upon his and his wife's real property in Gladstone, North Dakota, as previously described, in favor of the Simeks in order to secure his promissory note to them, when in fact he did not do so.

The Court further concludes that the Simeks justifiably relied upon the Erdmans' false representations, which, *alone or in combination,* caused the Simeks to sustain such loss and damage as is evidenced by the Erdmans' indebtedness to them pursuant to the loan agreement, and additional indebtedness stemming from the same; and that the Simeks' injury is the proximate result of the Erdmans' false representations.

Notwithstanding the Court's determinations thus far, if the Simeks are to prevail against the Erdmans personally, they must pierce SBD's corporate veil, for the obligation incurred in this matter, and from which all losses herein stem, was incurred, at least on its face, by that company.

### 3. Piercing the Corporate Veil

■ "Whether to pierce a corporate veil is a legal determination that, in our circuit, is governed by state law." *Stoebner v. Lingenfelter,* 115 F.3d 576, 579 (8th Cir.1997). The North Dakota Supreme Court summarized the grounds necessary to justify piercing of the corporate veil in *Hilzendager v. Skwarok,* 335 N.W.2d 768 (N.D.1983). The *Hilzendager* Court began by stating the general rule of corporate liability before citing its exception, as follows:

It is the general rule that officers and directors of a corporation are not generally liable for the ordinary debts of the corporation. *Danks v. Holland,* 246 N.W.2d 86, 90 (N.D.1976). However, in *Schriock v. Schriock,* 128 N.W.2d 852,

trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the

objection." Fed.R.Bankr.P. 4005.

866 (N.D.1964), our court stated: " '. . . but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.' Fletcher, *Private Corporations* Sec. 41 (1963 rev. vol.)." *See also Danks v. Holland, supra; Family Center Drug Store, Inc. v. North Dakota St. Bd. of Pharm.*, 181 N.W.2d 738, 745 (N.D.1970).

*Id.* at 744. The court then went on to adopt the following series of eight factors which support imposition of individual liability:

1. Insufficient capitalization for the purposes of the corporate undertaking;
2. Failure to observe corporate formalities;
3. Nonpayment of dividends;
4. Insolvency of the debtor corporation at the time of the transaction in question;
5. Siphoning of funds by the dominant shareholder;
6. Nonfunctioning of other officers and directors;
7. Absence of corporate records;
8. The existence of the corporation as merely a façade for individual dealings.

*Id.* (citing *Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn.1979)). Subsequently, the court made its analysis two-prong, by further requiring that there be, in addition to a confluence of several of *Hilzendager* factors in existence in a given matter, also, "an element of injustice, inequity or fundamental unfairness . . . present before a court may properly pierce the corporate veil." *Jablonsky v. Klemm*, 377 N.W.2d 560, 564 (N.D.1985). The *Jablonsky* Court allowed that the facts upon which unfairness is found may also be coextensive with those which support findings under the *Hilzendager* factors. *Id.* It also allocated the burden of proof, and the deference to

be accorded trial courts, in such matters, as follows: "The burden of establishing a basis for piercing the corporate veil rests on the party asserting the claim. Resolution of the issues is heavily fact[-]specific and, as such, is peculiarly within the province of the trial court." *Id.* at 565 (citations and internal quotation marks omitted).

■ The facts in the instant matter, as previously recited, overwhelmingly support disregarding the corporate entity to hold the Erdmans personally liable for the fraud they committed upon, and the harm they did, the Simeks. First, in the instant matter, SBD did not declare dividends.

This, in turn, is explained by the fact that, according to its president and would-be sole "shareholder," the company never issued shares of stock. Further, it had no board of directors, but merely a director, to wit, Mr. Erdman. Also it did not pay salaries to its officers. It did, thus, exhibit a disregard for keeping all of the corporate formalities. Moreover, it did not declare dividends.

Additionally, Mr. Erdman freely commingled his assets with those of the company, and appropriated corporate assets— in particular, the Simeks' loan proceeds and title to the antique limousine—for himself and his wife. In this respect, the corporation merely served as a façade for the Erdmans' fraudulent self-dealings with the Simeks.

Relatedly, Mr. Erdman—who, if not a "shareholder," is recognized by all parties as the outright owner of SBD—siphoned $12,500.00 out of the company as "reimbursement" for the $12,500.00 of loan proceeds which he applied towards the purchase of the antique limousine, and which loan proceeds were *intended for SBD* but appropriated by him.

Next, the record reflects that there was, in substantial part, a nonfunctioning of officers in the company. Willard Erdman is most representative of this, having entirely non-performed in his role as vice

president. However, Mr. Erdman, himself, admittedly abdicated all corporate responsibility related to his role as the president of SBD, opting instead to act merely as one of its bankers. Very little was developed concerning Mrs. Erdman's function in the company as one of its vice presidents, however, she indicated that as secretary-treasurer her function was that of taking minutes on several occasions.

Lastly, all credible evidence developed in this matter tends to demonstrate that SBD was sorely undercapitalized. From its inception, it was at the very least, and by Mr. Erdman's own account, very thinly capitalized. Soon after its inception, and from then on, it would repeatedly require cash infusions from lending institutions and from Mr. Erdman himself, to meet its basic obligations. Yet, towards the end, the company could not even meet these responsibilities. Even absent this last consideration, however, the Court would be left to conclude under the *Hilzendager* factors, that the Erdmans did, in their dealings with the Simeks, abuse the privilege of operating in the corporate form.

Finally, under the second prong of the North Dakota Supreme Court's analysis, that expressed in *Jablonsky, supra,* the Court concludes that there are elements of injustice, inequity, and fundamental unfairness present in the Erdmans' dealings with the Simeks which also support the piercing of the corporate veil, such elements being based, in large part, in the Erdmans' practice of false representations upon the Simeks in order to obtain a loan from them. Thus, under the principles enunciated in *Hilzendager, supra,* and *Jablonsky, supra,* the Court deems it appropriate that both Mr. and Mrs. Erdman be personally liable for the debts of SBD to the Simeks, that is, for the entire debt stemming from the Simeks original loan to the Erdmans. Moreover, their liability shall be expressed in the form of a monetary judgment, which, as before noted, has been the practice of this Court to apply as remedy under § 523(a)(2)(A).

#### 4. Attorney Fees

In this last connection, regarding the Erdmans' entire indebtedness, the Court observes that the base promissory note executed by Mr. Erdman provides the Simeks with the right, upon any default thereunder, to recover "all costs of collection," including reasonable attorney fees, from the Promissor—that is, in light of the above, Mr. Erdman. Thus, attorney fees are properly included in the nondischargeable debt under § 523(a)(2)(A) in the instant matter "because attorney[ ] fees provided by contract, like accrued interest, can become part of the debt." *Alport v. Ritter (In re Alport )*, 144 F.3d 1163, 1168 (8th Cir.1998); *see In re Hunter,* 771 F.2d 1126, 1131 (8th Cir.1985).

### III. CONCLUSION

Accordingly, and for the foregoing reasons, IT IS ORDERED THAT Plaintiffs Richard A. and Paule J. Simek are hereby GRANTED judgment in their favor and against Debtor–Defendants Mark and Loraine Erdman, jointly and severally, in the amount of $27,677.68, together with legal interest, and all reasonable attorney fees incurred in bringing their cause of action. IT IS FURTHER ORDERED THAT the sum of $27,677.68 is declared nondischargeable in the Erdmans' Chapter 7 bankruptcy case pursuant to 11 U.S.C. § 523(a)(2)(A).

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

**SO ORDERED.**